RICHARD MORAN, Plaintiff-Appellant, v. GEORGE LALA *et al.*, Defendants-Appellees.

Second District   No. 2—88—0499

Opinion filed February 21, 1989.

Erwin Cohn, of Cohn & Associates, of Chicago (Charles A. Cohn, of counsel), for appellant.

Sullivan, Smith, Hauser & Noonan, Ltd., of Waukegan (Michael K. Noonan, of counsel), for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Richard Moran, appeals from a jury verdict in favor of the defendants, George Lala and Larry Castle, denying him recovery for personal injuries suffered when he was shot in the right eye while a business invitee on the premises of the defendants. On appeal, plaintiff raises the following issues: whether the trial court committed reversible error in refusing plaintiff's instructions on concurrent causation; and whether the jury verdict in favor of defendants is against the manifest weight of the evidence. We affirm.

Plaintiff was invited by Robert Boles, his daughter's boyfriend, to participate in war or survival games which were held on defendants' premises. The games are combat-type games played by two teams in a wooded area. Each team attempts to capture the other team's flag. Each player is armed with a paint pellet $CO_2$ gun with which he would "kill" opponents by firing a paint pellet at them. Prior to the beginning of the games, plaintiff was shot while standing in a grassy area known as the "free zone."

Plaintiff testified that he was familiar with fire arms and hunted every day of the hunting season, but he had never participated in war games. On June 2, 1985, he, Boles, and two other men, later identified as Joe Twomey and Danny Ross, arrived at the site where the

war games were to be played. After waiting for everyone to get there, either Lala or Castle requested that everyone sign a document which was captioned a "Rental Agreement." The rental agreement stated as follows:

> "ALWAYS WEAR GOGGLES IN OR NEAR THE PLAY-FIELD (NO SMOKING ALLOWED IN PLAYFIELD) I am completely aware of all of the risks involved and that there is the possibility of additional risk if the GAME EQUIPMENT does not function properly. I also indemnify the lessor INTER-NATIONAL GAMES AND SUPPLY against, and shall hold both harmless from, any and all claims, actions, suits, proce-dures, cost expenses, damages and liabilities, including attor-neys fees arising out of or in connection with, or resulting from playing the GAME and/or the equipment. Including without limitation, the manufacture, selection, delivery, possession, use or operation of the equipment and the natural environment. I the under signed knowing these facts nevertheless wish to as-sume any and all risks. I hereby waive and release the lessor on behalf of my estate and all others who may play the GAME with me. I also undertake to always play the GAME only in ac-cordance with the safety instructions, rules and suggestions presented to me. Knowing full well the intense physical/mental exertion required to play the GAME, I further warrant that I have no medical problems that this increase in physical/mental exertion would cause me or others harm. I have read and fully understand the terms of this lease agreement. *THIS IS FULLY INTENDED TO BE A LEGALLY BINDING CON-TRACT. IF YOU HAVE ANY DOUBTS CONCERNING ANY ASPECT OF ITS CONTENTS, CONSULT AN ATTORNEY BEFORE SIGNING IT!!!*
>
> I STATE THAT I AM AT LEAST 18 YEARS OF AGE AND IN GOOD HEALTH. Defendants' Ex. No. 4." (Emphasis in original.)

Plaintiff glanced at the rental agreement for a few seconds before signing it. As the participants signed the document, their names were called off, and they were issued guns and pellets. According to plain-tiff, no goggles were issued at that time. After plaintiff had done some target shooting, someone told him that he better wear goggles, so he went over to a table and picked up a pair from a big box. Plain-tiff put on the goggles to make sure they fit. He had them on for less than a minute, then he put them up on his forehead like most of the other participants had done.

Plaintiff stated that at one point, he was told by either Lala or Castle that on the playing field goggles were to be worn at all times, and there was to be no smoking or drinking. Except for how to play the game, plaintiff did not recall any other orientation or other explanation regarding the rental agreement.

Plaintiff was standing in a large circle with the other participants. He lit a cigarette. He then felt pain in his right eye area. He covered his face with his hand. He felt that the area was wet, and he realized that he had been shot. Someone wiped his face off with a wet rag. While he was being cleaned up, the remains of part of a pellet were discovered near his right eye. He then was driven to the hospital where he stayed overnight.

On cross-examination, plaintiff admitted that he had not only signed the rental agreement but, as requested, had printed his name, address, and phone number on the document as well. Plaintiff did not remember being told that the rental agreement had to be signed before the participant would receive the equipment and could play. Plaintiff also stated that they were standing in the group while teams were being selected just prior to going out into the field.

Plaintiff did not know who fired the shot that struck him, nor did he know if the shot was intentional or an accident. The shot that struck him was not fired from the target practice area but from another group of individuals not included in target practice. Plaintiff did recall being advised that during the game, even with goggles on, the participant should not shoot at the face but only the body.

Robert Boles testified on behalf of plaintiff as follows. He had participated in war games four or five times prior to June 2, 1985, and was familiar with the rules for playing the game. Upon arriving at the defendants' premises, he and plaintiff and the other two men unloaded their coolers and stood around talking with the other participants, about 40 in all.

Castle and Lala then had everyone sign a document Boles referred to as a "release," saying that they were not responsible for personal injuries. The participants were told to read the release. After signing the release, the guns were given out after the fee was paid. The participants were given a tube of paint, and then someone handed out goggles. Boles got his goggles right after getting his other equipment.

After getting his gun, Boles walked back to the grassy area called the "free zone." He wore his goggles on top of his head, as were most of the participants. He showed plaintiff how to load the gun.

Defendants then advised the group that the goggles were to be

worn at all times on the field, but they could be taken off when the participants came back in from the field. After the orientation, Boles was standing in the free area smoking a cigarette when plaintiff collapsed. At that time, Boles' goggles were on top of his head. Castle and Lala came over to the plaintiff; neither of them was wearing goggles.

On cross-examination, Boles testified that he had talked to plaintiff about the games and explained them to him.

According to Boles, prior to the pistols being issued, the defendants dry-fired each one. Then the $CO_2$ cartridge was installed, and the gun was fired to see if it operated properly, and the cartridge was sealed properly. If the cartridge was not sealed properly, the gas would escape, and the first shot would come out very slowly.

Boles admitted that at some point before the release was signed, it was explained that the defendants would not be responsible for injuries that occurred and that were reflected in the rental agreement. As far as Boles observed, everyone who paid the fee and received a gun also received eye goggles. After the guns had been passed out, the defendants provided instructions as to how to load the gun. Boles did not know who was holding the gun that discharged the pellet that struck plaintiff.

David Mayer testified for plaintiff as follows. He was a participant in the war games on defendants' premises on June 2, 1985. He had played such games four or five times before. After he arrived at the game site, he signed a document. Then the guns and ammunition were handed out. He did not receive goggles at that time, nor was an orientation presented at that time.

Mayer proceeded to get five to six people together to form a "little army." About 10 to 15 minutes later, he went over to a table and got a pair of goggles from a box. He then put them on. Mayer was walking towards the playing field, with his goggles on, talking to other people when plaintiff was struck. He saw plaintiff grab his face and go down. Mayer walked over to him and observed that plaintiff was covered with paint across his face and eye and was holding his eye. Plaintiff was in the free zone when he was struck.

After the incident, Mayer stayed on to play the game. If a player was hit during the game, he returned to the free zone. Once there, Mayer observed that the participants did not wear their goggles.

On cross-examination, Mayer admitted that because he had played the game before and knew that he would be signing such a document as the rental agreement, he did not pay any attention to any discussion regarding that document. After the selection of the team, the

next phase would be to "fight the war," more or less. Mayer did not know who shot plaintiff, or if it was accidental or intentional.

William J. Katoch, Jr., testified on behalf of plaintiff as follows. He also had had prior experience playing such games. He and some friends attended the games at defendants' site on June 2, 1985. He signed in on the sign-up sheet which he did not read, providing his name and address. The rules of the game were also explained. Katoch was one of the first to receive his gun. It was not until after a few people had gotten their guns that goggles were distributed. According to Katoch, everyone had to help themselves to the goggles. Katoch wore safety glasses rather than goggles, because safety glasses fogged up less. He wore them on top of his head.

Katoch was standing a few feet away from plaintiff when he was shot. He did not hear anything but observed plaintiff drop to his knees, holding his face. He did not notice where plaintiff's goggles were. Katoch did some target shooting and thought he probably was wearing his safety glasses while he was shooting.

On cross-examination, Katoch testified that as far as he could observe, everyone who was supposed to wear goggles had them on. The witness did not know whether plaintiff was shot intentionally or accidentally.

Carl Dean Dahn, a consulting engineer, testified on behalf of the plaintiff. Dahn received a bachelor of science degree in aeronautical engineering and had five hours of post-graduate study in photographic techniques. For the past 20 years, he has trained in conducting engineering hazards analysis and safety analysis. He has also conducted engineering hazards analysis on weapon systems and also on firing ranges. Over defendants' objections, Dahn was qualified as an expert witness.

Dahn reviewed the rental agreement and the depositions of plaintiff, defendant, and the witnesses to the accident. Based upon his review of these documents, Dahn was of the opinion that the presence of pistols with cartridges and $CO_2$ cartridges and pellets in the free area zone was extremely hazardous and dangerous, because they could be loaded and accidentally fired in that area. The preferable procedure would have been to keep the weapons out of the free zone area and to have a separate staging area where participants could pick up their pistols as they entered. The area where the guns were kept should have been at least 60 feet away from the free zone, since the type of pellet gun used here would put out an eye at a distance of 30 to 60 feet.

On cross-examination, Dahn testified that he did not have either a

masters degree or Ph.D. He did not visit the site where the game was played, nor did he examine any of the weapons. He acknowledged that there was a certain amount of risk in such war games and that no amount of rules or regulations are effective or will work if they are disregarded.

Andy Otter testified on behalf of the defendants as follows. He participated in the war game held on defendants' site on June 2, 1985. The defendants would not let anyone play the game who had not signed defendants' agreement. He and the other participants received goggles and were told by the defendants to wear them at all times. The weapon he was issued was equipped with a safety that prevented the trigger from being pulled. The participants were instructed to keep the safety on at all times in the neutral zone.

On cross-examination, Otter did not recall that the agreement was called a "rental agreement." He stated that Lala and Castle had told the participants that goggles were to be worn at all times, even in the neutral zone. The neutral zone was approximately an acre of land. While the participants waited for the start of the game, there was some target shooting going on. Otter did not know if the defendants had their goggles on or not.

Jill Otter, Andy Otter's wife, testified on behalf of the defendants. She also participated in the war games on the defendants' site on June 2, 1985. This was prior to her marriage to Andy Otter. She identified the rental agreement as the document she signed on June 2, 1985. Prior to signing the document, the defendants read the document to the participants, told them to read it and sign it, and that they were playing at their own risk. Eye goggles were given out, and the participants were told to leave the safety on the trigger of the weapon whenever they were in the neutral zone.

On cross-examination, Mrs. Otter testified that she remembered very specifically that the participants were told to leave the safety on at all times in the neutral zone. They were given an orientation speech by one of the defendants prior to signing the rental agreement. Each participant was given a copy of the agreement to read before signing. She did not remember what she did with the copy she was given, nor did she recall what the defendants called the agreement. If the participants were in the free zone, they were not playing.

The evidence deposition of defendant George Lala was read into evidence.

Lala testified that he has been in the U.S. Navy for the past nine years and is one of the owners of International Games, which is in the business of putting out war games. Lala described what a war game

is and how it is played, as well as what equipment is used.

On June 2, 1985, he and his partner, defendant Castle, conducted a war game at Pleasant Prairie Township in Wisconsin. It consisted of a very large grassy area which was called a free zone and a wooded area which was used as the playing field. The free zone is an area where a player would stand and stay in if he was shot. The player would wait there until the game was over. It was also the area where the equipment was issued to people. The game was not allowed to be played in that area.

Upon the defendant's arrival at the grass site, an inventory of equipment was conducted, and the equipment was checked to see if anything was broken. Three kinds of goggles were available. Tests were conducted to make sure that the goggles did not break.

Prior to the commencement of the games, while in the free zone, the defendants conducted a lecture about the release form (the rental agreement), and those who had not prepaid would pay the fee at that time as well. The release form would either be read verbatim or paraphrased, and it would be stated that defendants were not liable for any injuries incurred in the field itself due to the dangers of the game. The lecture also covered the necessity for wearing goggles on or near the playing field. Lala had given the orientation speech on June 2, 1985.

Lala identified the rental agreement as the document used on the date plaintiff was injured. He recalled that plaintiff took his time signing the release.

The equipment was in the separate boxes. Goggles were given out first, and they were then checked to make sure they were clean. The participant was then given a gun loaded with $CO_2$ which was done by one of the defendants as a further check to make sure the gun was functioning properly. All the guns but one, which was removed, were in good working order. After all the guns were distributed, defendants informed the participants not to load the guns themselves, but the defendants would show them how to load their guns properly, which they then did. The participants were told to put on their goggles and leave them on unless they were returning to their vehicles. In the event the goggles fogged up on the playing field, there was a strict procedure for defogging the goggles. After the goggles were issued, there was an area within the free zone for target practice.

At the time plaintiff was struck, the participants had just been instructed on how to load the gun and about wearing the goggles. There were a few people using the target range. Lala had begun to walk back to where the vehicles were parked when he heard someone

say that someone was hurt. He turned and saw plaintiff kneeling on one knee, holding his right eye. Plaintiff had paint over his head and face which Lala assumed was from the paint pellet. After plaintiff's face was wiped off, Lala and two other people took plaintiff to Victory Memorial Hospital.

All of the weapons used were found to be in working order. Lala did not know who fired the shot that struck plaintiff, nor whether it was accidental or intentional. Lala observed plaintiff wearing the goggles over his eyes immediately after he issued them to him.

On cross-examination, Lala testified that prior to owning International Games, he participated in the playing of war games. He received information about safety training from National Survival Games. He also had pamphlets from that organization. He had the benefit of safety lectures at the war games in which he was a participant. There are also safety lectures given once a month on the base where he was stationed. He had not taken a specific course on safety in war games.

Lala did not explain unless asked by the participants why the release the participants signed was called a rental agreement. He did not remember on June 2, 1985, whether he explained why it was a rental agreement. All the participants were told they could take their time reading the agreement. The "contact" person who reserved the field for the games was told that there would be a document for the participants to sign. A copy of the document was given to the "contact" person if requested. Posters advertising the games did not state that a rental agreement would have to be signed before the games could be played.

On the date plaintiff was injured, the rental agreement was on a table. After a participant signed the rental agreement, he was handed goggles, then the gun and pellets. The participant was told at the time he received the goggles to put them on and that they were to be kept on, on or near the playing field. The participants were told that the free zone was considered near the playing field. They were also told not to load their guns. Lala assumed the participants were told that the first shots could have more velocity than the others. Both defendants would move around the area to make sure that the goggles were being worn and to see if there were any problems with the weapons. Lala was over in the target shooting area, but from what he could see of the free zone, everyone had their goggles on.

Lala recalled that in a war game he played in Tennessee, no one was allowed to have guns in the free zone. In Lala's opinion, that would not have made much difference.

The jury returned a verdict in favor of the defendants, and the plaintiff's post-trial motions were denied. This appeal followed.

We note at the outset that the plaintiff's brief is in violation of Supreme Court Rule 341(e)(4)(ii) (_____ Ill. 2d R. 341(e)(4)(ii)). Rule 341(e)(4)(ii) was amended on August 1, 1988, and provides in pertinent part as follows:

> "(ii) In a case appealed to the Appellate Court, a brief statement or explanation under the heading 'Jurisdiction' of the basis for appeal, *e.g.*, whether as a final judgment under Rule 301 or Rule 304(a) or (b); or as an interlocutory appeal pursuant to Rule 306, Rule 307 or Rule 308."

Plaintiff's brief was filed on August 22, 1988, but contains no jurisdictional statement as required by Rule 341(e)(4)(ii). While failure to comply with supreme court rules can result in the waiver of the issue or issues raised, we do not elect to do so at this time, since when plaintiff's brief was filed, the amendment was a relatively new one, and it is readily apparent in this case that this court has jurisdiction to hear this appeal. This should not be taken as a license to ignore the requirements of our supreme court rules, and in the future, such violations will be dealt with all appropriate consequences.

Turning to the merits of this appeal, plaintiff contends that the jury's verdict for the defendants was against the manifest weight of the evidence, given the fact that the testimony of plaintiff's expert, Charles Dahn, was unrebutted and the fact that defendants failed to introduce any evidence to rebut plaintiff's *prima facie* case of negligence. Plaintiff also contends that the trial court committed reversible error when it failed to give the defendants' instructions on proximate cause. Finally, plaintiff contends that the defendants failed to prove their affirmative defense, *i.e.*, that the rental agreement that plaintiff signed barred any recovery against the defendants.

Plaintiff argues, first, that since the testimony of his expert witness, Charles Dahn, was uncontradicted by any evidence presented by the defendants, it may not be disregarded by the trier of fact. Plaintiff further argues that he presented a *prima facie* case that defendants were negligent for allowing pistols and ammunition in the free zone and that defendants' negligence was a proximate cause of plaintiff's injury. Plaintiff bases his showing of a *prima facie* case on the fact that the trial court denied a directed verdict on plaintiff's negligence count and that the trial court instructed the jury on plaintiff's allegation of negligence for permitting pistols in the free zone.

Testimony by a credible witness neither impeached nor contradicted cannot be disregarded by the trier of fact. (*Soft Water Ser-*

*vice, Inc. v. M. Suson Enterprises, Inc.* (1976), 39 Ill. App. 3d 1035, 1042.) Assuming the jury found Dahn's testimony to be credible, the jury was not required to find that the permitting of weapons and ammunition caused plaintiff's injury since there is no conclusive evidence as to where the pellet was fired from.

■■ Plaintiff also argues that the evidence is overwhelming that defendants failed to enforce the wearing of goggles in the free zone and failed to warn that goggles must be worn there. The evidence on this point is highly disputed. The credibility of witnesses and the weight to be given their testimony are matters for the jury to determine, and unless its determination is manifestly against the weight of the evidence, it will not be disturbed on appeal. *Cratsley v. Commonwealth Edison Co.* (1976), 38 Ill. App. 3d 55, 58.

Plaintiff also contends that the trial court erred in refusing to give the following instructions:

> "More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame." Illinois Pattern Jury Instructions, Civil, No. 12.04 (2d ed. 1971) (hereinafter IPI Civil 2d).

> "If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury." IPI Civil 2d No. 12.05.

> "When I use the expression 'proximate cause,' I mean [that] [a] [any] cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. [It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.]" IPI Civil 2d No. 15.01.

The trial court refused all three instructions but did give the first sentence of IPI Civil 2d No. 15.01, as follows:

> "When I use the expression 'proximate cause,' I mean a cause which, in natural or probable sequence produced the injury complained of."

In refusing IPI Civil 2d No. 12.04, the trial court stated as follows:

> "The court cannot find any testimony that a third party was in fact negligent, not that a third party wasn't involved in the injury in fact happening, but there is no evidence that there

was any negligence that was the proximate cause of the injury.

There is such a thing as a pure accident, but there is no evidence that it was an accident, intentional or any evidence whatsoever as to how in fact the gun was discharged or became discharged which in fact caused the injury. I don't think it would be appropriate and I think it would be confusing to the jury to submit them this instruction on the particular facts in this particular case."

The trial court refused IPI Civil 2d No. 12.05 on the basis that there was no evidence that anything other than the pellet that struck plaintiff's eye caused his injury. The trial court then refused to give the long form of IPI Civil 2d No. 15.01, stating as follows:

"Well, if there's evidence, for instance, there is some evidence that's been submitted to the jury, if they decide to believe that, that permitting guns to be used, that there was negligence by the defense to permit guns in the free zone.

Now, that is what's alleged, is the proximate cause by allowing that to happen, a gun discharged, and arguably it was discharged in the free zone which in fact caused the injury. He wasn't struck by two pellets, he wasn't also simultaneously hit by something else, hit over the head, or the van back [sic] into him. There just is no evidence that anyone else was negligent or that anyone else did anything, not that maybe—I presume that someone did, but that's speculation or guess as to whether someone did or a gun discharged by itself or someone dropped a gun or it was a rebound, a ricochet from somewhere else and just happened to strike the plaintiff."

The notes following IPI Civil 2d No. 15.01 provide:

"This instruction in its entirety should only be used when there is evidence of a concurring or contributing cause to the injury or death (other than acts or omissions of the plaintiff). In cases where there is no evidence of a concurring or contributing cause, the short version without the bracketed material should be used." IPI Civil 2nd No. 15.0 (Notes on Use).

In *Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, plaintiff sued the Illinois Central Railroad Company (IC) after being assaulted by a vagrant while she waited for a train. In reversing and remanding a decision in favor of the IC, our supreme court stated as follows:

"It cannot be denied that if the negligence of the defendant only furnishes a condition and that condition causes an injury by the subsequent independent act of a third person, the crea-

tion of the condition is not the proximate cause of an injury. However, the rule is that the subsequent independent act, in order to break the causal connection, must be one, the intervention of which was not probable or foreseeable by the first wrongdoer. What constitutes proximate cause has been defined in numerous decisions, and there is practically no difference of opinion as to what the rule is. The injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinary prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which resulted from his act." (383 Ill. at 380.)

The supreme court in *Neering* determined that the IC knew that the congregating of vagrants and hobos around the passenger station created a source of potential danger from which it is obligated to protect its passengers. See also *Ray v. Cock Robin, Inc.* (1973), 10 Ill. App. 3d 276.

Plaintiff relies on *Neering, Ray,* and a number of other cases wherein defendants have been found negligent even though a third person or cause intervenes. See *Laukkanen v. Jewel Tea Co.* (1966), 78 Ill. App. 2d 153 (IPI Civil 2d No. 15.01 to be given in entirety when weather conditions are a factor to be considered in determining the cause of plaintiff's injury); *St. Clair v. Douvas* (1959), 21 Ill. App. 2d 444 (criminal act, an intervening but not superseding cause, combined with defendant's negligence caused plaintiff's loss of support); *Albright v. Parr* (1984), 126 Ill. App. 3d 464 (customer at a gas station fell through a plate glass window of insufficient strength); *Lewis v. W.F. Smith & Co.* (1979), 71 Ill. App. 3d 1032.

■ We agree with plaintiff that the failure to give the aforesaid instructions was error. There was evidence that plaintiff was struck by a pellet while standing in the free zone area with approximately 40 others who were also participating in the war games. There was evidence that the participants were all equipped with $CO_2$ guns which discharged paint pellets. There is no allegation that defendants shot the plaintiff with a $CO_2$ gun. It may be reasonably inferred from the evidence that one of the $CO_2$ guns discharged the pellet which struck the plaintiff. The fact that the source was not identified is not determinative of whether the instructions should have been given in this case. Where it could have been reasonably foreseen that some injury might result from the negligent act or omission complained of (in this case, the use of the loaded $CO_2$ guns in the free zone), it is not essen-

tial that the precise consequences which actually resulted therefrom should have been foreseen, nor is it necessary that the exact particulars of the accident which actually occurred should have been foreseen. (*Ray,* 10 Ill. App. 3d at 285.) We therefore agree with plaintiff that given the presence of the $CO_2$ guns in the free zone, it was foreseeable that someone would be shot.

We now must determine whether the error in failing to give the above instructions was error requiring reversal. Plaintiff relies on *Heitz v. Hogan* (1985), 134 Ill. App. 3d 352. In that case, the reviewing court held that the failure to give IPI Civil 2d No. 15.01 was sufficiently prejudicial to the plaintiff there that it required reversal. However, in *Heitz,* the reason the trial court found the lack of the instruction to be so prejudicial was that neither party tendered the shorter version of IPI Civil 2d No. 15.01 and the jury remained uninstructed on proximate cause. Also indicative of the prejudice to plaintiff in that case was the fact that during its deliberations, the jury inquired as to whether it was to consider negligence at the time of impact or preceding and including the time of impact.

In the case before us, the jury did receive the short version of IPI Civil 2d No. 15.01 and therefore was instructed as to proximate cause. We therefore conclude that the failure to give the above instructions was not in and of itself reversible error.

We are further inclined toward our decision that such error was not reversible in this case because, contrary to plaintiff's position, we are of the opinion that there was sufficient evidence for the jury to find that the rental agreement bars plaintiff's recovery regardless of the proof of defendants' negligence. In regard to defendants' affirmative defense, the jury was instructed in pertinent part as follows:

> "In this case, the defendants have asserted an affirmative defense that:
>
> Plaintiff executed a complete release of the defendants prior to renting the equipment or participating in the event and prior to the injury.
>
> The defendants have the burden of proving this defense and must prove the following:
>
> That plaintiff Richard Moran knowingly executed Defendants' Exhibit No. 4 (the rental agreement); and
>
> That he chose to assume any and all risks arising out of or in connection with or resulting from the playing of war games; and
>
> The defendants made no false representation intending to induce plaintiff to sign Defendants' Exhibit No. 4.

If you find from your consideration of all the evidence that each of the propositions required of the plaintiff has been proved, and one or more of the allegations of the defendants' affirmative defense has not been proved, then your verdict should be for plaintiff. If on the other hand, you find from your consideration of all of the evidence that one or more of the propositions the plaintiff is required to prove has not been proved, or that the defendants have proved each of the propositions of their affirmative defense, then your verdict should be for the defendants."

Under this instruction, the jury could determine that plaintiff had proved that the defendants' negligence was the proximate cause of his injury, but would still be required to return a verdict for the defendants if it determined that defendants had proved all the elements of their affirmative defense. This instruction was received by the trial court with no objection.

■ Clauses that exculpate a person from the consequences of his own negligence will be upheld in the absence of any statute voiding them. (*Erickson v. Wagon Wheel Enterprises, Inc.* (1968), 101 Ill. App. 2d 296, 301.) Plaintiff argues that the rental agreement only releases the defendants from liability arising out of the playing of the war games or the equipment.

The parties may not have contemplated the precise occurrence which resulted in plaintiff's accident, but this does not render the exculpatory clause inoperable. (*Harris v. Walker* (1988), 119 Ill. 2d 542, 549, citing *Schlessman v. Henson* (1980), 83 Ill. 2d 82, 86.) In *Schlessman*, the court also concluded that where parties adopt broad language in a release, it is reasonable to interpret the intended coverage to be as broad as the risks that are obvious to the experienced participant. (83 Ill. 2d at 86.) Although the plaintiff had not previously participated in war games, he testified that he hunted and was familiar with weapons. Therefore it is reasonable to infer that the dangers of engaging in an activity in which weapons were used would be obvious to him. Moreover, the rental agreement does provide that plaintiff would indemnify and hold defendants harmless from "any and all claims, actions, suits, procedures, cost expenses, damages and liabilities including attorneys fees arising out of or in connection with, or resulting from the playing of the game and/or the rental of the equipment. Including without limitation *** possession, use or operation of the equipment." We conclude, therefore, that there was sufficient evidence for the jury to conclude that the possession of $CO_2$ guns on the free zone was contemplated by the rental agreement and was a risk

assumed by the plaintiff.

● ■ ■ Where there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and defendant, having failed to request special interrogatories, cannot complain. (*Witherell v. Weimer* (1987), 118 Ill. 2d 321, 329.) Plaintiff argues that the above rule is only applicable where a *plaintiff* proceeds on more than one theory of recovery, and the jury returns a guilty verdict. We disagree. One of the cases relied in *Witherell* to support the above rule is *Fernandez v. Industrial Comm'n* (1978), 71 Ill. 2d 283. In that case, the supreme court stated:

> "On this record the Industrial Commission could have found that the petitioner's [Fernandez'] symptoms were the result of normal degenerative processes aggravated by the automobile accident, and were not causally connected with her employment. It even could have found that she was not suffering any disability. We do not know which rationale its decision was based upon, because petitioner failed to request specific findings on these points. (See Ill. Rev. Stat. 1971, ch. 48, par. 172.54(e).)" (*Fernandez*, 71 Ill. 2d at 286.)

Even though there is a reliance on a statutory requirement in *Fernandez*, we find it significant that the supreme court used that case as authority in the *Witherell* case for the necessity of special interrogatories. We take it as an indication that the rule applies to plaintiffs, as well as defendants. Therefore, since there is sufficient evidence to sustain the jury's finding in favor of defendants' affirmative defense, the not guilty verdict need not be disturbed even though it was error not to give plaintiff's instructions.

■ ■ A verdict is against the manifest weight of the evidence when an opposite conclusion is clearly apparent (*Tabor v. Tazewell Service Co.* (1958), 18 Ill. App. 2d 593), or the finding of the jury appears to be unreasonable, arbitrary, and not based upon the evidence. (*Stobbs v. Cumby* (1956), 9 Ill. App. 2d 138.) Our review of the record leads us to the conclusion that the verdict of the jury in this case was supported by the evidence and therefore is not against the manifest weight of the evidence.

The judgment of the circuit court is affirmed.

Affirmed.

REINHARD and McLAREN, JJ., concur.