# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 99-1340

_____

|  |  |  |
|---|---|---|
| Wheeling Pittsburgh Steel Corp., | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Beelman River Terminals, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: December 13, 1999
Filed: June 20, 2001

_____

Before BEAM, HEANEY, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

In this breach of a bailment contract action brought by Wheeling Pittsburgh Steel Corporation (a manufacturer of steel coils and sheet steel) (Wheeling) against Beelman River Terminals, Inc., (a warehouseman) (Beelman) for damages to approximately 3,000 tons of Wheeling's steel held in Beelman's warehouse during the Mississippi River flood of 1993, the jury returned a verdict in favor of Beelman. Wheeling argues on appeal that the district court submitted erroneous instructions to the jury, erred in several of its evidentiary rulings, and erred in excluding evidence of certain damages.

For the reasons stated below, we agree with several of Wheeling's allegations of error and therefore reverse and remand the case to the district court for a new trial.

## I.  Background

The underlying issue in dispute is whether Beelman is legally responsible for the damage to Wheeling's steel stored in Beelman's warehouse, which was inundated by flood waters during the great Mississippi River flood in the summer of 1993.

The steel, consisting of both steel coils and sheet steel, had arrived in St. Louis by barge.  It was destined either to be trucked by Beelman to Wheeling's customers as and when sold, or to Wheeling's corrugating plant in Lenexa, Kansas, for further processing into corrugated steel products for sale to other Wheeling customers.

On June 26, 1993, the Mississippi River reached its flood stage of 30 feet near Beelman's warehouses in St. Louis, Missouri.  Prior to 1993, the highest recorded river level at this point on the Mississippi was 43 feet in the spring of 1973.  The floor elevation of the warehouse holding Wheeling's steel was 42 feet, and the steel was further protected by a 4-foot high concrete warehouse wall.  St. Louis's city floodwall protects the city up to a river level of approximately 50 feet, and the city controls the closing of the three flood gates providing access to Beelman's warehouses, which are located between the floodwall and the river's normal edge.  The three floodgates are at elevations of 37 feet, 38 feet, and 41 feet.  As long as the floodgates remained open, it would have taken about 24 to 36 hours for Beelman, with its own substantial trucking resources, to move all of Wheeling's steel to a safer location.

By July 1, the river had risen to 32 feet with a prediction of a further increase of 7 to 7.5 feet by July 7.  By July 2, the river had risen to 32.5 feet and the crest prediction had risen to 40 feet by July 7.  The city closed the first floodgate on the afternoon of July 2.  On that same day, Sam Beelman, the president of Beelman, faxed

a memo to Wheeling saying its steel was safe. He also talked to a Wheeling representative on the phone and declined Wheeling's offer of assistance, saying it was unnecessary at that point. In addition, Sam Beelman left town on July 2 for the holiday weekend and the only other experienced warehouseman at Beelman was on vacation as well.

By July 3, the river was at a level of 34.5 feet; by July 5, it had risen to 37.1 feet necessitating the closure of the second floodgate (Sam Beelman had returned by this time); and by July 7, the river was at 38.6 feet. On that day, Beelman learned that the last floodgate would be closed soon and at that point contacted Wheeling about the potential threat to its steel. Wheeling took immediate steps to remove the steel but could only remove a small portion before the last floodgate providing access to the warehouse was closed. Beelman continued to work to protect the steel--by sandbagging, sealing the warehouse where the steel was located, and installing pumps-- but by July 17 the river had risen to over 45 feet and it became too dangerous to continue efforts to protect the steel. The river ultimately rose to a level of approximately 49 feet, and at some time during the river's rise from 45 to 49 feet the warehouse was flooded with water and the steel was damaged. The steel sat under muddy water for weeks.

Beelman argued at trial that the Mississippi River flood in the summer of 1993 was so extraordinary and unprecedented that no reasonable person would have expected it to rise as high as it did, and that Beelman acted diligently and reasonably in protecting Wheeling's steel. Sam Beelman testified that he thought he could protect the steel up to a river level of 45 feet by sandbagging, which he did, and that he had no idea the river would rise to a higher level until it was too late to move the steel. Wheeling countered by arguing that Beelman, as a prudent warehouseman, should have warned Wheeling earlier about the potential danger and that Beelman should have moved the steel--and had the time and resources to do so--once the city began closing the floodgates and it became evident that the flood of 1993 was not a typical flood.

3

Based on the evidence presented at trial, the jury returned a verdict in favor of Beelman. In this appeal, Wheeling argues that the trial court erred by submitting erroneous instructions to the jury regarding the burden of proof and the proper standard of care, erred in admitting testimony from an expert hydrologist that exceeded the scope of his expertise, erred in excluding admissions of responsibility for the damage made by Sam Beelman after the flood and an admission of concern as early as July 1 for the safety of the steel, and erred by ruling that damages were limited to the replacement cost of the steel.

## II. Analysis

### A. Jury Instructions

The standard for reviewing alleged errors in jury instructions is

> whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury. The form and language of jury instructions are committed to the sound discretion of the district court so long as the jury is correctly instructed on the substantive issues in the case. We will reverse on the basis of instructional error only if we find that the error affected the substantial rights of the parties.

White v. Honeywell, Inc., 141 F.3d 1270, 1278 (8th Cir. 1998) (internal citations and quotations omitted). "In diversity cases the substance of jury instructions is a matter governed by the applicable state law." Fox v. Dannenberg, 906 F.2d 1253, 1258 (8th Cir. 1990). Accordingly, the jury instructions, when read as a whole, must fairly and adequately present the relevant state law. See Walton Gen. Contractors, Inc. v. Chicago Forming, Inc., 111 F.3d 1376, 1382 (8th Cir. 1997).

4

Relying on Federal Rule of Civil Procedure 51, Beelman argues that this court is limited to plain error review of Wheeling's instructional error claim because Wheeling did not object properly to the instructions. We disagree. The transcript of the instruction conference convinces us that Wheeling's claim of instructional error has been properly preserved for appeal. (See Trial Tr., Vol. IV at 103-117.) Beelman relies upon Rolscreen Co. v. Pella Prods. of St. Louis, Inc., 64 F.3d 1202, 1211 (8th Cir. 1995) (finding that objecting party merely submitted a proposed alternative instruction, made one weak specific objection, and did not sufficiently bring into focus the nature of the precise alleged error) to support its contention that Wheeling did not properly object to the proposed instructions. Beelman's reliance on Rolscreen is misplaced, however, due to factual differences between the two cases in the nature of the objections raised with respect to the jury instructions, as shown by the respective trial transcripts. In the present case, Wheeling made its objections known numerous times, the district court had the opportunity to correct the alleged error, and we are confident the experienced district court understood the basis for Wheeling's continued objections. See Meitz v. Garrison, 413 F.2d 895, 899 (8th Cir. 1969) (finding trial court's full understanding of the nature of the objections to the jury instructions overcame any failure to literally comply with Fed. R. Civ. P. 51); Cone v. Beneficial Standard Life Ins. Co., 388 F.2d 456, 462-63 (8th Cir. 1968) (holding that failure to follow Fed. R. Civ. P. 51 formalities does not bar appellate review of instructional error claims when the parties specifically discussed the alleged error during an instructions conference and the trial judge recognized the conflict between the alleged error and the actual instructions given to the jury).

Turning to the underlying merits of Wheeling's instructional error claim, Wheeling specifically contends that the trial court erred by rejecting its proposed jury instruction No. 13a, which reads as follows:

> Because the parties have stipulated that plaintiff's property was delivered
> to Defendant in good condition and returned in damaged condition, your

verdict must be for plaintiff unless you find one or more of the following facts have been proved: First, that defendant used ordinary care for the protection of plaintiff's property while that property was in the possession of defendant or; Second, plaintiff's damages were not a direct result of the failure of defendant to use ordinary care.

(Appellant's Supp. App. at BA-246.) Instead, the district court submitted the following instructions, No. 7 and No. 8, respectively, to the jury:

## No. 7

Your verdict must be for plaintiff if you find: First, defendant failed safely to store plaintiff's steel, and [s]econd, because of such failure, defendant's contract obligations were not performed, and [t]hird, plaintiff was thereby damaged. Unless you believe that plaintiff is not entitled to recover by reason of Instruction Number 8.

## No. 8

Your verdict must be for the defendant if you find: The damage to plaintiff's property was caused by circumstances beyond the control of the defendant including Act of God, flood or unusual action of the river, and defendant was diligent in attempting to remove such cause or causes.

(Id. at BA-238-39.)

Our review of Missouri law convinces us that the district court misconstrued the nature of the precise issue that should have been presented to the jury. The district court correctly concluded that Wheeling's lawsuit was a contract-based, rather than a negligence-based, cause of action. The district court, however, proceeded under the assumption that the lawsuit was a simple breach of contract action, and thus (if that assumption is true) properly put the burden on Wheeling to prove that Beelman breached the contract. We believe, however, that under Missouri law the lawsuit

6

should have been viewed as a breach of a bailment contract action, which has different requirements for allocating the burden of proof and appropriate standard of care.

> The term "bailment" in its ordinary legal sense signifies a contract resulting from the delivery of a thing by the bailor to the bailee on condition that it be restored to the bailor in accordance with his directions as soon as the purpose for which it was bailed is satisfied. Where the bailor pleads and presents evidence of breach of the bailment contract by the bailee failing to return the article in an undamaged condition, the burden of proof is on the bailee to plead and prove due care on its part; "to excuse or explain his failure to return the property."

Temple v. McCaughen & Burr, Inc., 839 S.W.2d 322, 326 (Mo. Ct. App. 1992) (citations omitted); see also Ryan v. Park-Rite Corp., 573 S.W.2d 450, 452 (Mo. Ct. App. 1978) (holding that in breach of bailment contract action, burden of proof rests upon bailee to prove ordinary care once bailor shows bailee failed to return bailment property in undamaged condition); Broadview Leasing Co. v. Cape Cent. Airways, Inc., 539 S.W.2d 553, 561 (Mo. Ct. App. 1976) ("We believe that in a bailment case, where the theory of the bailor's action is based on breach of contract, the burden of proof lies with the bailee to plead and prove due care on its part."); Crow Contracting Corp. v. George F. Smith Co., 407 S.W.2d 593, 597 (Mo. Ct. App. 1966) (placing burden of proof in breach of bailment contract action on bailee to explain failure to redeliver bailment property in undamaged condition).

Notwithstanding Beelman's objections and the district court's view of the case, we think the contract between Beelman and Wheeling is a quintessential bailment contract. In a similar case involving damage to property during the 1993 Mississippi River flood, the Supreme Court of Missouri held that a bailment relationship existed when a bank rented a safe deposit box to one of its customers pursuant to a written rental agreement. See Seitz v. Lemay Bank & Trust Co., 959 S.W.2d 458, 461, 463 (Mo. 1998) (en banc). Similarly, in the present case, we conclude that a bailment relationship existed between Beelman and Wheeling.

7

We further conclude that the written contract neither expressly nor impliedly changed the burden of proof. As pointed out in a recent Missouri decision,

> unless a contract provides otherwise, the law applicable thereto at the time and place of its making, including statutory provisions and judicial precedents, is as much a part of the contract as though it were expressly referred to and incorporated in its terms . . . [and] it is presumed that the parties had the well settled law of the land in contemplation when the contract was made.

Sadler v. Board of Educ. of Cabool Sch. Dist., 851 S.W.2d 707, 712-13 (Mo. Ct. App. 1993) (citations omitted). The district judge insisted during the instructions conference that the Missouri common law of bailment did not apply because the case involved nothing more than a simple storage contract dispute. The district judge reasoned that a common law bailment contract is an implicit contract whereas there is an explicit contract involved in this case. For the reasons and cases cited above, we respectfully disagree. We hold instead that the district court erred by submitting instructions to the jury which at best were ambiguous as to which party had the burden of proof and at worst erroneously placed the burden of proving lack of due care or diligence on Wheeling.

Just as with allocating the burden of proof, Missouri's common law of bailment also affects the standard of care required of Beelman. "Absent contrary contract terms, the duty of the bailee . . . is to exercise ordinary care in the custody, preservation, and care of the bailed property." Seitz, 959 S.W.2d at 463 (citation and internal quotations omitted) (emphasis added). The contract specifically states that

> [e]xcept to the extent otherwise expressly stated herein, no liability shall result to Wheeling or to Beelman from a nonperformance caused by circumstances beyond the control of the parties affected, including but not limited to, act of God, flood, or unusual action of the river. And each party shall be diligent in attempting to remove such causes.

8

(Appellant's Supp. App. to Reply Br. at SA-48.)  We do not think that this contract provision changes the underlying standard of care under Missouri's common law of bailment, which is ordinary care in the preservation of the bailed property.  There is little practical difference between ordinary care and diligence.  See Broadview Leasing, 539 S.W.2d at 564 ("Under the law, the bailee is required to exercise only ordinary care, but 'care' is a relative term, and the circumstances of each case must be considered.  That standard of care is variable.  Whether the bailee exercised due care or ordinary diligence is a question more of fact than law."); Berger v. St. Louis Storage & Comm. Co., 116 S.W. 444, 445 (Mo. Ct. App. 1909) ("The defendant warehouseman is a bailee, and the contract, being for the return of specific articles stored upon demand of plaintiff, was one of bailment.  The obligation of the warehouseman bailee in such circumstances is to exercise ordinary care to protect the property intrusted to him; that is, to use such care and diligence looking to its safety as ordinarily prudent persons in that business are accustomed to exercise toward such property or in the care of their own property under similar circumstances.") (citations omitted).  Moreover, even if ordinary care and diligence are sufficiently different to justify a legal distinction, Beelman would still have to prove that he was diligent in dealing with the flood threat to the bailed property.  In other words, Beelman's actions must be compared to those of a diligent warehouseman entrusted with steel, not simply compared to a grocery store owner, a shopping mall owner, or a homeowner protecting his or her property during a flood.

In sum, we find that the instructions, when taken as a whole, did not fairly and adequately present the applicable Missouri law to the jury.  The instructions were at best ambiguous as to which party had the burden of proof and they did not explain adequately the proper standard of care on which to judge liability.  Furthermore, we do not think the error was harmless, because whether Beelman is legally liable for the damage to the steel seems to be a very close and difficult question in the circumstances of this case, and in close factual situations such as the present one, the standard of care

9

and burden of proof have heightened importance and can easily affect the jury's ultimate verdict.  The jury may well return the same verdict in favor of Beelman after a new trial upon proper instructions, but we do not think the instructional error was harmless, but instead was harmful, prejudicial, and reversible.

## B.  Evidentiary Rulings

Because evidentiary questions which arose during the trial may well arise again on remand, we proceed to determine the other issues raised in the appeal.

Wheeling specifically alleges that the district court abused its discretion by allowing Beelman's expert hydrologist to testify about matters beyond the scope of his expertise, by excluding an alleged admission of fault by Sam Beelman, and by excluding the evidence of Sam Beelman's July 1 letter to his company's insurance broker.

## 1.  Admission of Expert Hydrologist Testimony

We review a district court's decision to admit expert testimony under an abuse of discretion standard.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 142 (1999) (citing General Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997)); Robertson v. Norton Co., 148 F.3d 905, 907 (8th Cir. 1998).  When it comes to admission of expert testimony under the Federal Rules of Evidence, a trial judge has a gatekeeping responsibility to "ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." Kumho Tire, 526 U.S. at 141 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993), and applying Daubert to the testimony of engineers and other experts).  A witness can be qualified as an expert by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, and it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case.  See

Kumho Tire, 526 U.S. at 156. Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, Kumho Tire, and related precedents.

To begin with, we agree with the district court that Dr. Curtis, a hydrologist specializing in flood risk management, easily qualifies as an expert under Federal Rule of Evidence 702. The real question is, what is he an expert about? Though eminently qualified to testify as an expert hydrologist regarding matters of flood risk management, Dr. Curtis sorely lacked the education, employment, or other practical personal experiences to testify as an expert specifically regarding safe warehousing practices. Dr. Curtis did not study warehousing practices during his formal education, he has not written about warehousing practices in any of his sixty-plus published articles, and he has never been employed by a warehouseman during any of the twenty-one projects on which he has worked. Although he has worked with entire communities and shopping centers, he has never prepared emergency response plans specifically for storage facilities or warehouses. Furthermore, he did not compensate for his lack of education or experience about warehousing by, for example, determining or studying the actions of other warehousemen along the Mississippi River in response to this or any other flood.

After carefully examining the transcript of his trial testimony, we conclude that the district court erred in allowing Dr. Curtis to testify beyond the scope of his expertise and that the inadmissible opinions expressed by him prejudiced Wheeling. Dr. Curtis repeatedly offered opinion testimony outside of his area of expertise on ultimate issues of fact that the jury was required to answer--namely, whether Beelman's actions met the required standard of care for warehousemen.

11

There is no doubt that Dr. Curtis was qualified to testify that Beelman was diligent and reasonable in assessing available river data in historical context, in making judgments about reasonably foreseeable river levels and the risks they posed to the warehouse in light of the available information. But that does not make Dr. Curtis qualified to testify as an expert regarding what specific efforts and specific levels of protection are consistent with good warehousing practices, which he repeatedly did during the trial. (See Trial Tr., Vol. III at 230; Vol. IV at 43-46.) Furthermore, Dr. Curtis's improper opinions went to the primary issue upon which the jury had to make a judgment. We are convinced that the district court abused its discretion in allowing Dr. Curtis to give opinions specifically about warehousing practices and that Wheeling was prejudiced as a result. See Weisgram v. Marley Co., 169 F.3d 514, 517-21 (8th Cir. 1999) (holding that portions of testimony from three different expert witnesses each lacked a sufficient foundation because they had exceeded the scope of the witness's expertise and thus were unreliable under Rule 702, and therefore it was an abuse of discretion to allow the testimony), aff'd, 528 U.S. 440 (2000); Robertson, 148 F.3d at 907-08 (ordering new trial after manufacturing/ceramics/materials expert offered opinions as to the adequacy of grinding wheel warnings because the opinion was not sufficiently reliable under Daubert due to the expert's lack of training, research, practical knowledge, or experience with respect to warning labels); see also Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir. 1997) (holding it was error for metallurgical engineer to give opinion testimony that a particular safe met industry standards for burglar deterrence when no industry standard for burglar deterrent safes was ever established and the expert had no personal knowledge about or experience with the industry).

## 2. Exclusion of Insurance-Related Evidence

We review a trial court's evidentiary rulings under an abuse of discretion standard, giving substantial deference to a trial court's exclusion of evidence under Federal Rule of Evidence 403 so long as the trial court's exercise of discretion "[does]

12

not unfairly prevent a party from proving [its] case." Honeywell, 141 F.3d at 1274 (citations omitted). "We review a district court's decision to exclude evidence for a clear and prejudicial abuse of discretion." Arnold v. Groose, 109 F.3d 1292, 1296 (8th Cir. 1997) (citation and internal quotations omitted).

We first address the exclusion of the alleged admission of fault by Sam Beelman. During a pretrial deposition, Roger Iverson, a surveyor-adjustor for Wheeling's first party insurance carrier, stated that when he surveyed the damaged steel, "[Sam Beelman] said I have insurance for this. This loss is our responsibility." (Appellee's Supp. App. at 15 (Iverson Dep., July 8, 1998).) Based on Mr. Iverson's deposition testimony, Wheeling later submitted an offer of proof to the district court. During the offer of proof, which was conducted outside the presence of the jury, Mr. Iverson testified once again that "[Sam Beelman] did say he was responsible for the damage." (Trial Tr., Vol. III at 131.) The district court excluded Mr. Iverson's testimony after concluding that it impermissibly suggested insurance.[1]

We believe that the district court's decision to exclude the proffered testimony under Rule 403 was not an abuse of discretion. When taken in context, the comments by Sam Beelman to Mr. Iverson have little probative value as an admission of fault. Just prior to the comments at issue, Sam Beelman had been explaining the extensive efforts he and his employees had undertaken to protect the steel. More importantly, the context shows that Sam Beelman, at the time he made the comments, was under the firm impression that he had first party cargo insurance that would cover the damage without respect to fault, as opposed to liability insurance that would only pay upon a showing of fault on the insured's part. Whether his insurance covers the damage or not, we do not think that Sam Beelman's comments amount to an admission of legal liability

---

[1]Although the district court did not explicitly base its decision to exclude Iverson's testimony on Fed. R. Evid. 403, the record indicates that the district court performed a Rule 403-type balancing test before reaching its decision.

or fault, but rather constitute an admission of responsibility for payment based on an erroneous view of what his insurance policy provided.[2]   Furthermore, the danger of unfair prejudice is substantial given that Sam Beelman would have to bring up the issue of insurance in order to explain to the jury the basis for his comments to Mr. Iverson. Thus, there is a strong likelihood that substantial amounts of trial time would be devoted to arguing about insurance coverage, which could divert the jury's attention from the real dispute in the case.  The danger of unfair prejudice is further increased by inserting the possibility of insurance coverage into the jury's deliberations.  In these circumstances, we do not find any abuse of discretion in the district court's decision to exclude the claimed admission pursuant to Rule 403.

Finally, we address the exclusion of Beelman's July 1 statement to its own insurance broker.  The evidence at issue was a letter from Sam Beelman to Beelman's insurance agent dated September 27, 1993, in which he stated the following:

> On or about July 1, 1993, I asked Bill Lutes to call you to confirm the coverage was in place because we were concerned with the rising flood waters.  At that point you told Bill to take necessary precautions in protecting the products from the flood water and you would get back to him.  On or about July 7, 1993, Bill called you again because he had not heard from you.  At that time you advised Bill that there was no problem with our coverage and that all of the commodities stored at our facility would be covered for water damage.  In either of these conversations you did not say "if we were legally liable[.]"  You indicated we were unequivocally covered.

---

[2]Although it may be true that Sam Beelman's beliefs about his insurance coverage, or lack thereof, may have probative value as it relates to his subjective motivation for the actions he undertook to protect Wheeling's steel during the flood, we do not think his subjective intent has much, if any, probative value on the ultimate question for the jury of whether Sam Beelman's actions were objectively reasonable and diligent as compared to other warehousemen.

14

(Appellant's App. at A-7.)

The following exchange occurred during Wheeling's direct-examination of Sam Beelman:

> Q:    So isn't it true, Mr. Beelman, that on July 1 of 1993 that a seven to seven and a half feet rise to 39 to 39-1/2 feet was predicted by July 7?
> A:    Yes.
> Q:    And isn't it true then that when you saw that prediction predicting the river to rise seven to seven and a half feet in six days, that that was an unusual and startling prediction?
> A:    Yes.
> Q:    And isn't it true that in light of that unusual and startling prediction that you became concerned for the safety of your customer's property in light of the rising flood waters?
> A:    Yes.

(Trial Tr., Vol. I at 80.)  During Sam Beelman's cross-examination, however, the following exchange occurred:

> Q:    At any time prior to July 7th did you think there was any danger at all to that steel in Warehouse No. 4?
> A:    No.

(Id. at 116.)

The presumption under the Federal Rules of Evidence is that all relevant evidence is admissible at trial unless specifically excluded by another rule.  See Fed. R. Evid. 402.  Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403. Beelman argues that the district court properly excluded this letter under Rule 403.  Beelman contends that the

15

letter has little probative value due to its lack of direct reference to the steel. Beelman also argues that the letter was cumulative to other evidence in which Sam Beelman admitted that he was concerned on July 1 about the river crest prediction at or above 39 feet, and that the rest of the letter was rife with prejudicial information about Beelman's liability insurance. Wheeling responds by arguing that the letter is highly probative on the question of when Sam Beelman became concerned for the safety of his customer's products, including the steel, and is very useful for challenging many contradictory statements made by Sam Beelman during the course of the trial.

We hold that the district court abused its discretion in excluding the September 27 letter evidence under Rule 403. We agree with Wheeling that the evidence in question is relevant to and probative of when Sam Beelman became concerned about the safety of the steel. The excerpt from the letter not only tends to show that Sam Beelman was concerned about the steel as early as July 1, but it also tends to discredit Sam Beelman's testimony throughout the trial that there was no reason for concern until it was too late. Thus, the excerpt from the letter provides factual support as to when Sam Beelman became concerned about the rising river level, provides a potentially very useful piece of information to attack Sam Beelman's credibility if the need arises, and buttresses Wheeling's claim that Beelman should have moved the steel earlier in the river's rise.

Relevance and significant probative value may not be enough, however, if admission of the evidence is highly prejudicial. Even though we agree with Beelman that the letter as a whole is highly prejudicial due to its repeated references to insurance, we nevertheless believe that the danger of prejudice can be minimized by admitting into evidence only the portions of the letter in which Sam Beelman expresses concern for the safety of the products entrusted to his company's care and control. We think the first three sentences of the excerpted portion, and if necessary redacting the words "to confirm the coverage was in place," would be sufficient to convey the relevant information without introducing too much potentially prejudicial information

16

about insurance. We leave it to the district court's discretion on remand, however, to decide exactly how much, if any, of the letter to redact, and/or whether additional safeguards such as a cautionary instruction to the jury are necessary. We also leave it to the district court's discretion on remand to determine as the record develops whether the letter is either necessary or useful for impeachment purposes, or if the letter is simply cumulative to and consistent with other testimony by Sam Beelman presented during the trial.

## C. Damages

We review a district court's determination of state law de novo. See Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991). In this case, the district court, relying on Meletio Seafood Co. v. Gordons Trans., Inc., 191 S.W.2d 983 (Mo. Ct. App. 1946), held that Wheeling's recovery of damages, if any, was limited to the steel's replacement cost and not its fair market value at the time of the flood. The district court reasoned that unless there is evidence of lost sales, replacement cost is the measure of damages instead of fair market value or lost profits. The district court found that, except for two customers, there was no evidence of lost sales, and with respect to those two customers, the court found no efforts by Wheeling to mitigate its damages, and it therefore barred recovery of any damages beyond the replacement cost of the steel.[3] Because damage instruction issues are likely to arise on remand, we think it necessary to make the following determinations.

---

[3] We cannot determine from the record whether the district court's decision that damages were limited to the replacement cost of the steel precludes damages for the reasonable profit margin attributable to Wheeling's manufacturing process--in other words, the wholesale value of the steel--or just precludes the profits from potential though not yet final retail sales of the steel, i.e., the difference between the wholesale market value and the retail price of the steel. We therefore construe the limitation on damages as including both of the above-mentioned bases for lost profits.

17

First, the district court's reliance on <u>Meletio</u> is misplaced. <u>Meletio</u> does not provide sufficient support for limiting Wheeling's damages to the cost of replacing the steel through its own remanufacturing efforts. This is particularly true in light of Missouri court decisions holding that the measure of damages is generally the difference between the reasonable market value of the goods immediately before the damage and the reasonable market value of the goods after the damage. <u>See, e.g.</u>, <u>Mincielli v. Sloan's Moving & Storage Co.</u>, 303 S.W.2d 17, 21 (Mo. 1957); <u>Emcasco Ins. Co. v. Auto Driveaway Co.</u>, 586 S.W.2d 780, 782 (Mo. Ct. App. 1979) (concluding that "in bailment cases involving property only and where there has not been a total loss or destruction of the property, the measure of damages shall be the difference between the fair market value of the property before it was damaged and its fair market value after it was damaged").

Second, we believe <u>Chevron Chem. Co. v. Streett Indus., Inc.</u>, 534 F. Supp. 801 (E.D. Mo. 1982), presents a proper interpretation of Missouri law that is directly applicable to the present case. In <u>Chevron</u>, a chemical manufacturer brought suit to recover damages from the defendant for failure to safeguard adequately 200,000 gallons of its manufactured chemical. The district court held that

> [t]he major concern when awarding damages is to compensate the plaintiff for the loss it has suffered. However, if a party can show a <u>loss of profits with reasonable certainty</u> over and above the replacement value of the goods destroyed or lost, compensation for lost profits may be recovered <u>in addition to the wholesale price</u>. Under Missouri law, there <u>may be a recovery for loss of profits</u> shown to be the natural and probable consequence of the act or omission complained of, <u>provided</u> the amount thereof is <u>shown with sufficient certainty</u>. . . . Under the circumstances of this case, it is clear that plaintiff [manufacturer] was holding the Alkylate 21 as part of its stock for the purpose of sale. In addition, the plaintiff manufactured this chemical which would ensure [the manufacturer] of its ability to replace the Alkylate 21 at the wholesale price. Therefore the value of this product should be determined <u>by reference to the wholesale</u>

market.  Furthermore, it is the opinion of this court that the plaintiff did not establish a loss of profits or sales with the requisite degree of certainty required by law.

Id. at 803-04 (internal quotations and citations omitted) (emphases added).[4]  Thus, although the manufacturer in Chevron failed to establish lost profits or sales in that particular case, those types of damages are not precluded as a matter of Missouri law. Moreover, we think there exist important factual disputes as to whether Wheeling actually lost sales (for instance, to customers Bull Moose and Hammond), whether efforts to mitigate beyond recovering the salvage value of the damaged steel would have minimized any losses, and whether it was reasonably certain that all of Wheeling's steel would have been sold at retail prices but for the flood.

Finally, even if Wheeling cannot prove lost sales and thereby lost profits with sufficient certainty, Chevron also makes clear that the value of Wheeling's steel should be determined by reference to the wholesale market.  In other words, Wheeling is entitled to at least a reasonable profit margin attributable to its manufacturing process, which can be determined by reference to the wholesale price of the same or very similar steel charged by other steel manufacturers at the time of the flood.  Stated another way, Wheeling's replacement cost is not to be measured by the costs it would incur in purchasing the necessary raw materials, electricity, and labor to manufacture its own replacement steel.  The fair market value of its damaged steel is what it would have cost Wheeling to purchase replacement steel of similar type and quality from

_____

[4]There is no showing in Chevron that the product involved was manufactured by anyone other than the plaintiff, and the only evidence of value was the plaintiff's cost of manufacturing the product (28.5¢ per pound) and its retail price (45.5¢ per pound). Given the absence of any other showing of a wholesale market for the product, it is not surprising that the court only permitted the recovery of the cost to Chevron of remanufacturing the product rather than what it would cost to replace the finished product by purchase on the wholesale market from a competing manufacturer.

another steel manufacturer on the wholesale steel market FOB, Beelman's warehouse, St. Louis.

In sum, we find that the district court erred in denying Wheeling the opportunity to prove lost profits as part of its damages. Under Missouri law, we hold that Wheeling is entitled to any lost profits attributable to its manufacturing process as determined by the wholesale value of the steel, as well as to any lost profits due to specific lost sales as a result of any breach of the bailment contract that it can prove with sufficient certainty as determined by the retail value of the steel. We leave the question of Wheeling's entitlement to any particular amount of damages, if any, to the jury under appropriate instructions.

## III. Conclusion

We conclude that the district court committed reversible error by erroneously instructing the jury as to the burden of proof and the standard of care under Missouri law, by allowing the expert hydrologist to testify to matters beyond the scope of his expertise, by improperly excluding evidence relating to Sam Beelman's admission of concern for the safety of the products stored in the warehouse as early as July 1, and by limiting damages to the cost of replacing the steel through self-remanufacturing. We also hold that the district court did not abuse its discretion when it excluded evidence of Sam Beelman's alleged admission of responsibility for the damage to Wheeling's steel. Accordingly, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.