BILJANA KRKLUS, Adm'r of the Estate of Frank Krklus, Deceased, Plaintiff-Appellant, v. ROBERT STANLEY et al., Defendants-Appellees.

First District (4th Division)   No. 1—03—3605

———

Opinion filed July 28, 2005.

Robert A. Clifford, Sheri L. Tarr, and Robert P. Sheridan, all of Clifford Law Offices, of Chicago, for appellant.

Edward M. Kay, John M. Hynes, and Paula M. Carstensen, all of Clausen Miller, P.C., of Chicago, for appellees.

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Biljana Krklus (plaintiff), as the administrator of the estate of her late husband Frank Krklus (Krklus), brought a medical malpractice action against defendants Dr. Robert Stanley and Rush Prudential Health Plans, Stanley's employer. Plaintiff alleged that Stanley negligently failed to diagnose Krklus' aortic dissection which ruptured, causing his death. Defendants denied liability and raised comparative negligence as an affirmative defense. Defendants maintained that Krklus was negligent in failing to follow Stanley's instructions to take medication to bring down his high blood pressure, misinforming Stanley that he was taking his prescribed medication, smoking cigarettes and failing to adequately identify the site of his pain. Following a trial, the trial court entered judgment on a jury verdict for defendants.

On appeal, plaintiff contends (1) that, because comparative negligence was not a proper defense, the trial court erred in allowing defendants to introduce evidence that Krklus failed to follow Stanley's

orders to take his blood pressure medication and that Krklus smoked cigarettes; (2) that the trial court erred in limiting the scope of plaintiff's cross-examination of Stanley concerning his postmortem alteration of Krklus' medical records; (3) that the trial court erred in failing to prohibit defendants from engaging in certain acts of misconduct; and (4) that the trial court erred in instructing the jury as to the defense of sole proximate cause and the affirmative defense of comparative negligence. Plaintiff maintains that, because this is a close case, the trial court's errors, in the aggregate, warrant a new trial.

Krklus first visited Stanley, an internal medicine physician employed by Rush Prudential Health Plans, in April 1996, following an elbow injury. During his next visit for the same injury in July 1996, Stanley diagnosed Krklus with hypertension. He prescribed atenolol, a medication designed to reduce blood pressure, and asked that Krklus return a week later so that Stanley could determine whether the medication was effective. A week later, Krklus' blood pressure was somewhat lower. At another visit in September 1996, Krklus reported that he was regularly taking his medication and Stanley determined that Krklus' blood pressure had substantially improved.

Krklus next visited Stanley's office on May 4, 1998, following another injury. Prior to seeing Stanley, Krklus was examined by nurse Christine Falasco. Krklus indicated to Falasco that he had stopped taking his medication more than a year prior to the visit. Stanley determined that Krklus' blood pressure was extremely elevated and prescribed a higher dosage of atenolol and a second blood pressure medication, Dyazide. The following day, Krklus returned to Stanley's office. Stanley determined that Krklus' blood pressure had gone down. At the visit, Krklus indicated that he had previously smoked a half a pack of cigarettes a day but that he had quit a month before. Krklus failed to return for his scheduled follow-up visit a month later.

On Saturday, April 3, 1999, Krklus began to feel ill after cleaning a friend's car. According to the testimony of plaintiff, Krklus' wife, and Christina Krklus, Krklus' daughter, who was home for the weekend, Krklus complained of nausea, a headache and chest pain. By April 9, 1999, Krklus' condition had not improved. Plaintiff called Stanley's office and spoke with nurse Mary Teister. Plaintiff indicated that she believed Krklus' blood pressure was elevated and that he was experiencing chest pain, stomach pain, a decreased appetite, an elevated temperature and diarrhea. Plaintiff told Teister that she suspected Krklus' condition was related to his inhalation of fumes from the cleaning solution he had used to clean his friend's car. Teister recorded the information reported by plaintiff in Krklus' medical

chart. Teister offered Krklus an appointment later that day but he chose to make an appointment for the following morning.

On the morning of April 10, 1999, Teister examined and questioned Krklus regarding his symptoms. Krklus indicated that he was experiencing pain below his rib cage, in his abdomen and in his sides and lower back but did not indicate that he was experiencing chest pain. Teister recorded this information in his chart. While Krklus was being examined by Teister, plaintiff reported to Falasco that he had not taken his blood pressure medication in four weeks and that he was experiencing chest pain radiating to his back, profuse night sweats, fatigue and dizziness. Falasco recorded the information provided by plaintiff in Krklus' chart. During his examination, Krklus reported to Stanley that he had been regularly taking his blood pressure medication and that he was experiencing epigastric, or upper abdominal, discomfort but denied that he was experiencing chest pain. An electrocardiogram (EKG) performed on Krklus was normal. Stanley diagnosed Krklus as suffering from gastritis, prescribed Maalox and Pepcid and advised Krklus to avoid alcohol and aspirin and to return in two to four weeks.

On April 16, 1999, plaintiff again contacted Stanley's office, indicating that Krklus' sinus congestion had worsened and requesting a referral to an ear, nose and throat doctor. Teister told plaintiff that in order to be referred to a specialist, Krklus was required to return to the office for another appointment.

Because his condition had worsened, Krklus returned to Stanley's office on April 19, 1999. Prior to being examined, Krklus reported to medical assistant Nina Patel that he was experiencing chest pain. During his examination by Stanley, Krklus again reported epigastric pain but did not report chest pain. Stanley testified that during the April 19, 1999, examination, Krklus reported experiencing similar symptoms to those he reported on April 10, 1999; however, his respiratory symptoms appeared to be more severe. Stanley observed that Krklus was suffering from an elevated blood pressure, a cough and postnasal drip, and a knot-like pain in the epigastrium. Stanley ordered a complete blood count, which showed a reduction in the amount of hemoglobin in Krklus' blood, but considered the results unremarkable. The results of a second EKG were normal. Stanley also administered a tuberculosis test. Stanley instructed Krklus to continue taking Pepcid and his blood pressure medication and to return within 48 hours so that his nurse could read the results of his tuberculosis test. Stanley also prescribed antibiotics and cough syrup.

According to plaintiff and Krklus' son, Jimmy Krklus, Krklus' condition continued to deteriorate. On the evening of April 20, 1999,

Jimmy went to his parents' house for dinner. When he arrived, Jimmy noticed that Krklus was pale, clammy and feverish. Krklus indicated that he was experiencing stomach, chest and lower-back pain. Jimmy testified that Krklus was unable to eat his dinner and went to bed early that evening. When plaintiff went to bed later on the evening of April 20, 1999, she found Krklus dead. During the weeks before his death, Krklus continued to work, missing only a few days, and appeared for jury duty between the manifestation of his symptoms and his death.

An autopsy performed on Krklus' body showed that he had died of a massive left hemothorax caused by an aortic dissection. An aortic dissection occurs when the innermost layer of the aortic lining ruptures, allowing blood to seep into the area between the outer layers. In this case, the collecting blood caused a second tear, or a rupture, in the outer lining of the aorta and collected in Krklus' pleural cavity, causing his death.

While Jimmy testified that his father was an occasional smoker who never bought a pack of cigarettes and Christina testified that she had never seen her father smoke, Krklus' medical records indicated a history of smoking. The records suggested that Krklus had smoked a half a pack of cigarettes a day for 10 years but none of the witnesses could exactly quantify the amount of cigarettes or how regularly Krklus smoked.

The records from the Walgreens pharmacy where plaintiff testified that her family filled all of its prescriptions showed that Krklus first filled his blood pressure medication prescription on July 31, 1996, after he was diagnosed with hypertension. He refilled his prescription on August 29, 1996, but did not refill it again until May 4, 1998, the date of another appointment with Stanley. Krklus refilled his prescription again on May 24, 1998, June 25, 1998, July 27, 1998, and August 25, 1998. He did not refill his prescription again until April 10, 1999, eight months later.

Plaintiff's expert Adam Robert Silverman, an internal medicine physician, testified that the classic symptom of aortic dissection is ripping abdominal or chest pain that radiates to the patient's back. Other symptoms may include heart palpitations, shortness of breath, pain in an arm or leg, profuse sweating, cough, nausea, diarrhea and epigastric pain. Aortic dissection can be detected by several methods, including by CT scan, and can be treated medically or surgically. Silverman testified that hypertension "may be associated" with aortic dissection. Silverman further testified that he did not consider hypertension a predisposing factor for aortic dissection because "some patients can have dissections without having high blood pressure." Silverman did,

however, acknowledge that hypertension can accelerate or aggravate an aortic dissection and that untreated hypertension is a "risk factor" for an aortic dissection. In Silverman's opinion, in failing to identify Krklus' symptoms of aortic dissection and failing to order tests that would aid in its diagnosis, Stanley deviated from the standard of care both on April 10, 1999, and April 19, 1999, causing Krklus' death.

Plaintiff's expert Robert Quigley, a cardiothoracic surgeon, testified that aortic dissection can present itself in a variety of ways, including abdominal pain, and that it may be treated surgically or medically. When asked about the connection between hypertension and aortic dissection, Quigley testified that there is an "association" between the two but that "[t]here is not a cause and effect." However, Quigley noted that, if a known hypertensive patient presents with symptoms of an aortic dissection, "there should be a heightened level of awareness" and "[m]aybe we should be thinking aortic dissection." In Quigley's opinion, the drop in Krklus' hemoglobin was remarkable in that it showed a possibility that Krklus was actively bleeding, perhaps into his pleural cavity. Given Krklus' symptoms, in Quigley's opinion, Stanley should have suspected and attempted to rule out aortic dissection both on April 10, 1999, and April 19, 1999. Consequently, Quigley concluded that Stanley did not comply with the standard of care. Had he complied with the standard by ordering additional tests to determine whether Krklus' aorta had dissected and hospitalizing Krklus, Stanley could have prevented Krklus' death.

Defendants' expert witness Jeffery Kopin, an internal medicine physician, testified that the classic presentation of aortic dissection, a rare disease, is intense tearing or ripping pain in the chest, radiating to the sides and back. In Kopin's experience, the pain associated with an aortic dissection is so intense that the patient will immediately seek emergency room treatment. Sinus congestion, fever and cough are not aortic dissection symptoms. Diarrhea also is usually not a symptom. While excessive sweating may be a symptom, excessive sweating only at night is not a symptom. Kopin found Krklus' drop in hemoglobin unremarkable. In Kopin's opinion, Stanley complied with the standard of care on April 10, 1999, and April 19, 1999, because the symptoms Krklus presented indicated that he was suffering from a viral infection and did not indicate aortic dissection. Kopin testified that the autopsy showed that Krklus suffered from left ventricle hypertrophy, an enlargement of the left ventricle, and cardiomegaly, an enlargement of the heart. Both conditions were caused by his untreated hypertension. Kopin opined that "the untreated blood pressure did contribute to the development of the aortic dissection" and that "[i]f Mr. Krklus had taken his blood pressure medication as

directed and if his blood pressure had indeed been controlled, *** I do not believe Mr. Krklus would have developed an aortic dissection." Kopin further opined that even if Krklus' dissection had been diagnosed, he would not have survived.

Defendants' expert witness Ronald Curran, a cardiothoracic surgeon, characterized the classic presentation of aortic dissection as a ripping or tearing chest pain. Often the pain is so severely incapacitating that the patient immediately proceeds to the emergency room for treatment. Neither sinusitis, fever, cough, diarrhea, night sweats nor knot-like abdominal pain is a symptom of aortic dissection. Curran found Krklus' drop in hemoglobin unremarkable. Curran testified that 85% of aortic dissection patients are hypertensive because hypertension weakens the artery wall, predisposing it to dissection. Curran opined that "if Mr. Krklus had taken his blood pressure medicine to control his blood pressure, he would not have developed an aortic dissection." Curran testified that Krklus' enlarged left ventricle and enlarged heart were also caused by his untreated hypertension. Because Krklus' symptoms on April 10, 1999, and April 19, 1999, were not consistent with aortic dissection and were instead consistent with the flu, sinusitis or bronchitis, in Curran's opinion, Stanley's treatment did not fall below the relevant standard of care.

At the close of defendants' case in chief, defense counsel read into evidence plaintiff's deposition testimony in which she stated that on the Saturday when Krklus' pain began, he indicated to her that he was having chest pain. Plaintiff stated that when he indicated that he had chest pain, Krklus was referring to pain below his rib cage. She also testified that during her April 9, 1999, phone call to Stanley's office, when she told Teister that Krklus was experiencing chest pain, she was referring to pain below the rib cage.

At the close of evidence, the trial court instructed the jury on the affirmative defense of comparative negligence and the defense of sole proximate cause. The jury returned a general verdict in favor of defendants. Following denial of her posttrial motion, plaintiff appealed.

On appeal, plaintiff first contends that the trial court erred in allowing defendants to introduce evidence that Krklus failed to regularly take his blood pressure medication in support of their theory that Krklus was contributorily negligent in failing to follow Stanley's instructions. Consequently, plaintiff further contends that the trial court erred in instructing the jury on the issue of comparative negligence and tendering the jury a verdict form that allowed it to reduce plaintiff's award in proportion to Krklus' negligence. Defendants argue that plaintiff may not raise this contention on appeal

because the jury returned a general verdict that could be supported by a finding that Stanley was not negligent and plaintiff failed to request a special finding as to the basis of the jury's verdict. Plaintiff fails to address this argument in her reply brief. Defendants further argue that the evidence was admissible because their theory that Krklus was comparatively negligent was proper.

When a jury returns a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the objecting party, having failed to request a special interrogatory as to the grounds for the verdict, cannot complain. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 492 (2002); *Witherell v. Weimer*, 118 Ill. 2d 321, 329 (1987). The requirement that the complaining party request a special interrogatory applies both to a complaining plaintiff and a complaining defendant. *Moran v. Lala*, 179 Ill. App. 3d 771, 787 (1989).

In this case, the jury returned a general verdict in favor of defendants. "This means that the verdict is silent as to the jury's reasons for finding in favor of defendant[s] since the jury did not answer any special interrogatories or enter any specific findings of fact." *Guy v. Steurer*, 239 Ill. App. 3d 304, 307 (1992). Verdict Form C, returned by the jury, specified that the jury could have entered its verdict either on the basis that (1) Stanley was not negligent or (2) Stanley was negligent but Krklus' contributory negligence was more than 50% of the total proximate cause of his death. We refuse to overturn the jury's verdict because we find ample evidence on the record to support a finding that Stanley was not negligent. Defendants' experts, Kopin and Curran, testified that the classic presentation of aortic dissection is a ripping pain in the chest, radiating to the sides and back. Both stated that abdominal pain is not typical of the disease and that the pain associated with aortic dissection was generally very intense. Furthermore, sinus congestion, fever and cough are not symptoms. On both April 10, 1999, and April 19, 1999, Krklus was experiencing sinus congestion, fever and cough. The jury was presented with conflicting evidence as to whether Krklus was additionally experiencing chest pain or whether his pain was confined to his abdomen. The jury was certainly entitled to find that the evidence that Krklus' pain was confined to his abdominal area was more credible, particularly in light of the impeachment of Krklus' family members concerning the location of his pain.

Because plaintiff failed to request a special interrogatory as to the basis of the jury's finding and because sufficient evidence was presented at trial to support a finding that Stanley was not negligent, we will not overturn the jury's general verdict based on plaintiff's contention.

Additionally, we note that, had the jury returned a verdict for defendants based solely on comparative negligence, we would have upheld the verdict because comparative negligence was an appropriate affirmative defense under the specific facts of the instant case.

"Case law is replete with instances where the physician charged the plaintiff with contributory negligence for behavior that occurred before the patient sought treatment. The courts generally agree that the patient's prior conduct should not be considered in assessing damages." M. Orr, *Comment: Defense of Patient's Contribution to Fault in Medical Malpractice Actions*, 25 Creighton L. Rev. 665, 687 (1992). However, Illinois courts recognize that exceptions exist to this general rule under certain circumstances. Illinois courts have held that comparative negligence applies when " '[t]he plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it.' " *Malanowski v. Jabamoni*, 332 Ill. App. 3d 8, 15 (2002), quoting Restatement (Second) of Torts § 465(1) (1965); *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 377 (2000). More specifically, "[i]n a medical malpractice action, a comparative negligence instruction is appropriate if a party presents a theory of the case in which the patient's negligence precedes or is contemporaneous with the physician's malpractice; for example, when a patient delays in seeking treatment for his or her medical condition or injury." *Malanowski*, 332 Ill. App. 3d at 15.

Several cases have examined the propriety of an affirmative defense of comparative negligence in the medical malpractice setting. In *Witherell*, the plaintiff patient alleged that the defendant doctor was negligent in failing to diagnose and treat her condition in 1976. The jury returned a verdict in favor of the plaintiff but reduced her award by 40% for her comparative negligence in proximately causing her injury. On appeal, the plaintiff alleged that her jury award should not have been reduced because the defendant had not properly pled comparative negligence as an affirmative defense. The supreme court held that, though the defendant failed to plead comparative negligence, the plaintiff was adequately apprised of the defendant's main points with regard to the defense and had an adequate opportunity to rebut them. The court further noted that the evidence presented at trial supported the trial court's instruction to the jury advising it "of seven grounds upon which a finding of comparative negligence could be based, including [plaintiff's] alleged refilling of prescriptions without her physicians' approval, taking medicine too frequently, insufficient physical activity, refusal to reduce her medication regimen, long automobile trips despite her doctors' warnings, and failure to report

continuous leg pain from 1963 through 1967." *Witherell*, 118 Ill. 2d at 339.

In *Smith v. Perlmutter*, 145 Ill. App. 3d 783 (1986), the plaintiff brought a medical malpractice suit, alleging that the defendant doctor's negligence in treating the deceased patient after he suffered a heart attack resulted in the patient's death. The plaintiff contended, on appeal from an order entered in favor of the defendant, that the trial court had erred in allowing a jury instruction regarding comparative negligence. The evidence at trial showed that the patient had failed to seek medical attention on three occasions when he experienced chest pain prior to the incident of alleged malpractice. The plaintiff's expert opined that the patient's failure to seek treatment after each incident was imprudent. The appellate court held that under such circumstances, the jury was properly instructed on comparative negligence.

In *Tsoukas*, the plaintiff patient brought suit against the defendant doctors alleging that they were negligent in failing to diagnose and properly treat a blood clot, resulting in the amputation of the plaintiff's foot. The jury returned a verdict in favor of the defendants. On appeal, the plaintiff contended that the trial court had improperly instructed the jury on comparative negligence rather than on the duty to mitigate damages. The appellate court noted that the plaintiff's theory of the case was that he had formed a blood clot prior to first visiting the defendants on December 5, 1991, and that the defendants had mistreated the condition as a sprained ankle or as poor circulation that day, which caused the ultimate loss of the plaintiff's foot. The defendants theorized that when the plaintiff first came to them for medical care on December 5, 1991, they properly diagnosed him with poor circulation due to diabetes and that "it was plaintiff's subsequent failure to follow defendants' sound medical advice to care for that condition which contributed to the formation of a blood clot on or about January 9, 1992, and the ultimate loss of his foot." *Tsoukas*, 315 Ill. App. 3d at 377-78. Because the facts in evidence or reasonable inferences therefrom supported both the plaintiff's theory and the defendants' theory, the appellate court held that the jury should have been given both mitigation of damages instructions and comparative negligence instructions.

Clearly, the above-discussed cases indicate that, in Illinois, comparative negligence can be a proper affirmative defense in a medical malpractice case. However, the question of whether comparative negligence is appropriate in a particular medical malpractice case must be decided on a case-by-case basis. Accordingly, we turn now to the facts of the instant case.

In this case, defendants introduced evidence that Krklus was negligent in failing to follow Stanley's medical advice to regularly take medication to control his blood pressure. At the close of trial, the court instructed the jury that it could consider Krklus' failure to heed Stanley's advice to take his medication as evidence of comparative negligence and could reduce plaintiff's award accordingly. Although the trial court did not specifically instruct the jury that it could also consider Krklus' act of misinforming Stanley, on April 10, 1995, that he had been regularly taking his medication as evidence of comparative negligence, we note that defendants could have requested such an instruction. At trial, Curran testified that the vast majority of patients who experience aortic dissection are hypertensive because hypertension weakens the artery wall, predisposing it to dissection. Both Kopin and Curran specifically testified that uncontrolled hypertension causes aortic dissection. Each further opined that, had Krklus followed Stanley's advice and taken his blood pressure medication, he would not have developed the aortic dissection. Though they refused to acknowledge that hypertension causes aortic dissection, plaintiff's experts conceded that hypertension is a "risk factor" and is "associated with" the development of an aortic dissection. Furthermore, plaintiff's own expert, Quigley, testified that, when a known hypertensive presents with symptoms indicative of an aortic dissection, "there should be a heightened level of awareness" and "[m]aybe we should be thinking aortic dissection." However, Krklus misinformed Stanley that he was controlling his hypertension. Because Stanley believed Krklus' hypertension to be controlled, his ability to diagnose Krklus' aortic dissection was complicated. Accordingly, we conclude that Krklus' failure to follow Stanley's advice and act of misinforming Stanley about his compliance therewith are exactly the type of "substantial factor[s]" that "[brought] about his harm," contemplated by the rule articulated in *Malanowski*; therefore, the trial court did not err in allowing introduction of the evidence in support of defendants' comparative negligence affirmative defense, nor did it err in instructing the jury that it could consider the comparative negligence in reaching its verdict. *Malanowski*, 332 Ill. App. 3d at 15.

We note, additionally, that, contrary to plaintiff's contention, our conclusion complies with the decisions of courts of other jurisdictions. The cases cited by plaintiff suggest that plaintiff objects to defendants' comparative negligence affirmative defense because, in her view, Krklus' actions merely created his need for treatment. We acknowledge that courts have not allowed evidence of contributory negligence in cases where a patient negligently creates the need for treatment. However, we note that courts have allowed evidence of contributory

negligence in cases where the need for treatment is independent of the patient's negligence, but the patient's subsequent negligence complicates the ability of the physician to provide treatment.

In *Harding v. Deiss*, 300 Mont. 312, 3 P.3d 1286 (2000), the deceased patient suffered from asthma, was allergic to horses and had a history of breathing difficulties. During a horseback ride, the patient began having trouble breathing and collapsed. She was taken to the hospital, where she was treated by the defendants. The patient died several days later. The defendants' theory of the case was that the patient was contributorily negligent in riding the horse. The trial court issued the jury instructions on comparative negligence and the jury found for the defendants. The Montana Supreme Court found that "comparative negligence as a defense does not apply where a patient's pre-treatment behavior merely furnishes the need for care or treatment which later becomes the subject of a malpractice claim." *Harding*, 300 Mont. at 318, 3 P.3d at 1289. It reasoned that acceptance of the defendants' argument that the patient's conduct in riding a horse when she had asthma should be considered evidence of comparative negligence "would lead to an absurd result. Under such a theory, in any case where the patient was responsible for events that led to her hospitalization, the treating physician would not be liable for negligent treatment." *Harding*, 300 Mont. at 318, 3 P.3d at 1289. Accordingly, the supreme court held that the trial court had abused its discretion in instructing the jury on comparative negligence.

In *Fritts v. McKinne*, 934 P.2d 371 (Okla. 1996), a negligent plaintiff patient caused a car accident. The defendant doctor was subsequently negligent in his treatment of the plaintiff's injuries resulting from the accident. The Oklahoma court found that comparative negligence was not an appropriate defense and held that "a physician simply may not avoid liability for negligent treatment by asserting that the patient's injuries were originally caused by the patient's own negligence." *Fritts*, 934 P.2d at 374. However, the court noted that, under certain circumstances, a plaintiff's actions prior to seeking medical treatment may be considered evidence of contributory negligence, including the plaintiff's delay in seeking medical treatment, failure to provide an accurate medical history and failure to follow the advice and instructions of a doctor.

In *DeMoss v. Hamilton*, 644 N.W.2d 302 (Iowa 2002), the plaintiff filed a medical malpractice suit against defendants, who had treated the deceased patient after he suffered a heart attack in 1996. The patient had been successfully treated for a heart attack in 1994 but had, in the interim, failed to follow his physicians' advice to stop smoking, lose weight and lower his cholesterol. The trial court

instructed the jury that it could consider the patient's contributory negligence in formulating its award. The appellate court found that the trial court erred in instructing the jury on comparative negligence because the patient's lifestyle choices had merely created his need for treatment. The court held that

> "to be considered as and constitute contributory negligence in a medical malpractice action, a patient's negligence must have been an active and efficient contributing cause of the injury, must have cooperated with the negligence of the malpractitioner, must have entered into proximate causation of the injury, and must have been an element in the transaction on which the malpractice is based."
> *DeMoss*, 644 N.W.2d at 306.

The Indiana appellate court drew a distinction between the above-discussed cases, in which the patient's negligence caused the need for treatment, and its case, in which the patient did not cause the need for treatment but her negligence complicated the ability of her physician to provide treatment. In *Cavens v. Zaberdac*, 820 N.E.2d 1265 (Ind. App. 2005), the deceased patient suffered from severe asthma for which she had been hospitalized several times. She was advised that when she experienced an extreme asthma attack, rather than relying on self-administered epinephrine injections, she should seek early emergency room treatment. On the evening of July 20, 1996, the patient suffered a severe attack which she attempted to treat with epinephrine injections with limited success. She did not seek emergency room treatment until 11:30 the next morning. The patient died that night. At the conclusion of the evidence, the trial court granted the plaintiff's motion for judgment on the evidence of the defendant's contributory negligence claim and precluded the defendant's attorney from arguing that the patient's conduct was the proximate cause of her death. The jury returned a verdict in favor of the plaintiff.

On appeal, the plaintiff contended that the trial court correctly precluded the defendant's contributory negligence argument because the patient's conduct merely created the need for treatment. The trial court rejected the plaintiff's argument, finding that contributory negligence was a proper defense. The court clarified:

> "The asthma attack itself, not conduct by [the patient] caused the *need* for treatment. [The patient] needed to go to the hospital regardless of her response to the asthma attack or her conduct after it began, as evidenced by the failure of her home medications to quell the attack. If [the defendant] was attempting to claim, for example, that [the patient] had exacerbated her asthmatic condition by smoking, or had otherwise brought on her attack by her

conduct, it would appear that such conduct would fall under the category of pre-treatment conduct that could not be considered contributorily negligent for purposes of a medical malpractice action. Such conduct only would have created the need for treatment. [Citation.] However, [the patient's] conduct in delaying seeking treatment and overmedicating herself did not create the need for treatment but, according to expert testimony [the defendant] presented at trial, was unreasonable and complicated his ability to treat her acute asthma attack and greatly reduced Miller's chances of survival." (Emphasis in original.) *Cavens*, 820 N.E.2d at 1276-77.

Our case is distinguishable from *Harding*, *Fritts* and *DeMoss* and is comparable to *Cavens*. In this case, Krklus' high blood pressure brought about a need for treatment. His failure to follow Stanley's advice to take the prescribed medication to treat his serious medical condition led to the development of his aortic dissection, according to the testimony of Curran and Kopin. Furthermore, Krklus' negligence in failing to follow Stanley's advice and in misinforming Stanley that he had been compliant with the advice complicated Stanley's ability to treat Krklus and reduced Krklus' chances of survival. Accordingly, as in *Cavens*, evidence of Krklus' contributory negligence was properly admitted.

Finally, we note that our conclusion is firmly rooted in the specific facts of the case at bar. We do not wish to imply that evidence of a patient's failure to comply with his physician's advice to improve his general health should be admissible as evidence of the patient's comparative negligence. Surely a doctor's unheeded general directions to, for example, lose weight, stop smoking or exercise should not be considered in assessing a patient's comparative fault. However, in this case, Krklus, a patient with a serious medical condition, failed to heed Stanley's advice to take medication to control the condition and subsequently misinformed Stanley that he had, in fact, complied with the advice. Furthermore, here, the experts agreed that Krklus' underlying hypertensive condition was related to the development of his aortic dissection. Curran and Kopin further testified that the cause of the dissection was Krklus' failure to heed Stanley's advice to control his hypertension with medication and that, had he taken his medication, Krklus' aorta would not have dissected. Accordingly, here, where such a strong nexus exists between the negligent acts of the patient and his resulting condition and death, comparative negligence is an appropriate affirmative defense.

■ Plaintiff next contends that the trial court erred in allowing defendants to present evidence of Krklus' smoking habit in support of

their theory that Krklus was contributorily negligent in continuing to smoke cigarettes. Again, defendants respond that plaintiff may not raise this complaint because the jury returned a general verdict and plaintiff did not request a special interrogatory as to the grounds of the jury's finding. Defendants further argue that the contention is waived because, though plaintiff attempted to bar the admission of such evidence through a motion *in limine* which was denied prior to the commencement of trial, she failed to object contemporaneously when the evidence was offered at trial. Finally, defendants respond that even if the evidence were not properly admitted, it did not prejudice plaintiff.

"[T]he denial of a motion *in limine* does not preserve an objection to disputed evidence later introduced at trial. The moving party remains obligated to object contemporaneously when the evidence is offered at trial." *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502 (1994). In the instant case, plaintiff not only failed to object when evidence of Krklus' smoking habit was introduced at trial, she actually interjected the matter into trial for the first time in her case in chief during direct examination of Jimmy. Accordingly, she has waived the issue on appeal. Furthermore, as discussed above, plaintiff failed to request a special interrogatory as to the basis of the jury's verdict and ample evidence was presented at trial from which the jury could determine that Stanley was not negligent in his treatment of Krklus. Accordingly, we refuse to overturn the jury's verdict based on this contention. Furthermore, we note that, even if the evidence of Krklus' cigarette smoking habit were improperly admitted to support the affirmative defense of comparative negligence, such evidence did not prejudice plaintiff. Very little evidence of Krklus' smoking habit was presented and the evidence that was presented showed that Krklus smoked very little.

Plaintiff next contends that the trial court erred in strictly limiting the scope of plaintiff's cross-examination of Stanley on the issue of the postmortem alteration of Krklus' medical records.

Defendant responds that plaintiff has waived the issue because she has failed to include Krklus' medical records in the record on review. While we acknowledge that the appellant bears the burden of supplying this court with a complete record on appeal and any doubts arising from an incomplete record will be resolved in favor of the appellee (*U.S. Minerals & Mining, Inc. v. Licensed Processors, Ltd.*, 194 Ill. App. 3d 428, 434 (1990)), we find that the issue is not waived because the medical records themselves are not necessary for this court to render a decision on this contention.

In general, a trial court's decision whether to admit evidence

will not be reversed absent an abuse of discretion. *Maffett v. Bliss*, 329 Ill. App. 3d 562, 571 (2002). "However, a trial court must exercise its discretion within the bounds of the law." *Hallowell v. University of Chicago Hospital*, 334 Ill. App. 3d 206, 210 (2002). Relevant evidence, that which " 'tends to either prove a fact in controversy or render a matter in issue more or less probable,' " is generally admissible. *Hiscott v. Peters*, 324 Ill. App. 3d 114, 124 (2001), quoting *Galowich v. Beech Aircraft Corp.*, 209 Ill. App. 3d 128, 135 (1991). However, when the probative value of the evidence a party seeks to introduce is outweighed by its prejudicial effect, the trial court may properly deny its introduction. *Koonce v. Pacilio*, 307 Ill. App. 3d 449, 463 (1999). Furthermore, the trial court will not be found to have abused its discretion when it precludes a party from presenting a potentially confusing argument which could only be based on speculation and conjecture. See *Schaffner v. Chicago & North Western Transportation Co.*, 161 Ill. App. 3d 742, 758 (1987).

■ In this case, after learning of Krklus' death, Stanley reviewed his medical records. Stanley noticed that the term describing Krklus' abdominal pain as "knot-like" was difficult to read. Accordingly, he reprinted the term "knot-like" in parentheses above the illegible term and dated the addition April 21, 1999. The medical records also contained many margin notes concerning Krklus' health that, Stanley maintained, were made contemporaneously with Krklus' various visits. Defendants filed a motion *in limine* to bar plaintiff from drawing any insupportable inferences that the margin notes or the medical records in general were not authentic from the fact that Stanley had rewritten "knot-like" after Krklus' death. The trial court ruled that plaintiff was permitted to ask Stanley when and how he entered the margin notes and why he rewrote "knot-like." However, the trial court disallowed plaintiff from accusing Stanley of making the margin notes to cover up his malpractice because the probative value of such an accusation would be outweighed by the prejudice it would cause defendants. Plaintiff was permitted, however, to examine Stanley and make such an allegation outside the presence of the jury. We agree with the trial court that the risk of prejudice to defendants was high should the plaintiff have been permitted to accuse Stanley of fabricating the margin notes after Krklus' death. Furthermore, such an accusation would have been purely speculative and completely unsupported. Under the circumstances, we cannot say that the trial court abused its discretion in limiting the scope of plaintiff's cross-examination of Stanley on the subject of the alteration of Krklus' medical records.

■ Plaintiff next contends that the trial court erred in denying

plaintiff's motion for new trial after defendants engaged in several acts of misconduct during the trial. Specifically, plaintiff contends that defendants' impeachments of Jimmy, Christina, Quigley and plaintiff were improper, that defendants improperly badgered plaintiff during cross-examination and that, in closing, defendants improperly argued an unsupported theory of sole proximate cause and improperly suggested that plaintiff bore the burden of proving that Krklus' uncontrolled high blood pressure was not the sole proximate cause of his death.

Defendants respond, first, that plaintiff has waived all of the above objections because she has filed to cite any supporting authority in her brief. An appellant's failure to cite legal authority in support of her arguments in her appellate brief violates Supreme Court Rule 341(e)(7) (188 Ill. 2d R. 341(e)(7)) and results in a waiver of those arguments. *Owens v. Snyder*, 349 Ill. App. 3d 35, 45 (2004).

We agree with defendants. Here, while plaintiff has cited case law in support of her contention that misconduct by defendants would warrant reversal of the case, she does not cite any legal authority supporting her contention that the individual acts of which she complains rose to the level of misconduct. Waiver aside, while we agree with plaintiff that attorney misconduct may be a basis for a new trial (*First National Bank of La Grange v. Glen Oaks Hospital & Medical Center*, 357 Ill. App. 3d 828, 833 (2005)), plaintiff's contention fails because, in this case, defense counsel did not engage in misconduct.

"The trial court has discretion to allow the admission of evidence for impeachment purposes, and a reviewing court will not disturb that decision absent an abuse of discretion." *Schiff v. Friberg*, 331 Ill. App. 3d 643, 656 (2002). The credibility of a witness may be tested by demonstrating that on an occasion prior to trial, the witness made statements that are inconsistent with those made at trial. *Schiff*, 331 Ill. App. 3d at 656. In order to be used for impeachment purposes, the prior statement must be materially inconsistent with the witness's testimony at trial. *Kotvan v. Kirk*, 321 Ill. App. 3d 733, 748 (2001). To be considered inconsistent, the prior statement need not be directly contradictory but must have a reasonable tendency to discredit the witness' testimony. *In re Lane*, 127 Ill. 2d 90, 104-05 (1989). For example, "[i]nconsistency is not limited to direct contradictions but may be found in evasive answers, silence, or changes in position." *People v. Hernandez*, 319 Ill. App. 3d 520, 532 (2001).

In this case, Jimmy testified that he was unsure of Krklus' retirement plans and that, because he was in good physical condition, Krklus could have worked for as long as he wished. Jimmy was impeached with his deposition testimony in which he stated that his father had

"two years to go" before retirement and specifically described his parents' retirement plans to relocate to Florida. Clearly, Jimmy's inconsistent deposition testimony discredited his testimony at trial; therefore, its admission was not an abuse of discretion.

At trial, Christina testified that during a phone conversation with Krklus in April 1999, he complained of chest pain. During her deposition, Christina testified that her father indicated to her that he was in increasing pain. When asked during the deposition if by pain she meant stomach pain, Christina answered in the affirmative. Later at trial, Christina testified that after cleaning the car on April 4, 1999, her father complained of chest and abdominal pain. During her deposition, Christina testified that on the evening of April 4, her father complained of stomach pain that radiated around his side. Again, Christina's testimony at her deposition, while not directly contradictory, was inconsistent and tended to discredit her testimony at trial and its admission was not an abuse of discretion.

Plaintiff objects to several instances in which she was impeached with her deposition testimony. In the first instance, plaintiff testified at trial that Krklus did not eat dinner the night of his death. She was impeached with her deposition testimony that the family had dinner together that evening. Plaintiff did not object to the impeachment; her contention regarding this specific instance of impeachment is, therefore, waived. *People v. Taylor*, 357 Ill. App. 3d 220, 225 (2005). Next, plaintiff testified at trial that on April 10, 1999, she informed Falasco that Krklus had not taken his blood pressure medication for four weeks. She was impeached with her deposition testimony. During her deposition, plaintiff first denied that she made such a statement to Falasco and later admitted that she suggested to Falasco that Krklus was not taking his medication but that she did not mention a specific period of time. Clearly, plaintiff's deposition testimony regarding her conversation with Falasco is inconsistent with plaintiff's trial testimony and was therefore properly admitted. Finally, plaintiff further testified at trial that she did not know when her husband planned to retire. Defense counsel attempted to impeach her with her deposition testimony that she did not know when her husband planned to retire but that she believed that he planned to retire before he was 65 years old. Significantly, the trial court sustained the plaintiff's objection to the impeachment. Accordingly, plaintiff's contention the trial court erred in allowing that this last instance of impeachment is completely without merit.

At trial, Quigley testified that he is aware that some people describe a "classic presentation" of aortic dissection but that he does not use such a term. He was impeached with his deposition testimony

from a different case in which he stated that the classic picture of aortic dissection is sudden chest pain with pain radiating through the patient's back. Again, this inconsistent testimony tends to discredit Quigley's testimony at trial and was properly admitted to impeach Quigley.

Plaintiff contends that the trial court erred in allowing defense counsel to badger plaintiff during cross-examination concerning a phone call she denied having received from Falasco.

The page of the record to which we are directed by plaintiff and the following page reveal that the following exchange took place:

"[Defense Counsel]: Did you get a message from Chris Falasco at about 12:40 p.m. to call back on Monday, April 19th?

[Plaintiff]: No.

[Plaintiff's Counsel]: I renew my objection [to foundation], your Honor.

THE COURT: The answer no may stand. Objection overruled.

[Plaintiff]: You mean 12:00 p.m. at night?

[Defense Counsel]: I am talking about the afternoon, ma'am, right after lunch, 12:40 p.m.

[Plaintiff]: On the 19th?

[Defense Counsel]: On the 19th, which would have been your husband went to see Dr. Stanley sometime later on the 19th.

[Plaintiff]: We went to Dr. Stanley's office after 3:00 o'clock.

[Defense Counsel]: Correct

[Plaintiff]: And I called just little bit before 3:00. I mean how could I talk to her at 12:00 o'clock?

[Defense Counsel]: Okay. This says LMTCB, which I will represent to you means left message to call back at 12:40 p.m.

[Plaintiff's Counsel]: I am going to object to foundation, your Honor.

THE COURT: Well, you're referring to something that is not within the personal knowledge of the witness. You can ask—The line of questioning is proper, but ask the question directly without reference to the exhibit.

[Defense Counsel]: Did you get a message from Chris Falasco at about 12:40 p.m. telling you to call back on April 19, 1999?

[Plaintiff]: No, I did not."

Having reviewed the portion of the record cited by plaintiff, we cannot find any indication whatsoever that defense counsel was improperly badgering plaintiff. On the contrary, defense counsel's questions seem entirely proper to ascertain whether plaintiff received a phone call from Falasco at 12:40 p.m. on April 19, 1999.

Finally, plaintiff contends that the trial court erred in allowing defendants to argue that Krklus' uncontrolled high blood pressure

was the sole proximate cause of his death when no evidence in support of that argument had be presented at trial and in allowing defendants to imply that plaintiff had the burden of proving that Krklus' failure to take his medication was not the sole proximate cause of his death. As discussed below, there was sufficient evidence presented at trial to support a theory of sole proximate cause. Here, therefore, we will discuss only plaintiff's contention that defendants' comments improperly shifted the burden of proof.

At the outset, we note that plaintiff has waived this contention on appeal because she failed to object during defendants' closing argument. *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96, 109 (2000). Waiver aside, plaintiff's contention is without merit.

In a negligence action, the plaintiff bears the burden of proving that the defendant proximately caused the plaintiff's injury. *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 232 (1990). The defendant is not required to plead a lack of proximate cause as an affirmative defense. *Korando v. Uniroyal Goodrich Tire Co.*, 159 Ill. 2d 335, 344 (1994). Consequently, if certain evidence negates causation, such as evidence that something besides the defendant's action was the sole proximate cause of the plaintiff's injury, the defendant should present it. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 94 (1995). Nonetheless, the burden of proof is not shifted to the defendant. See *Leonardi*, 168 Ill. 2d at 94 (holding that a defendant need not plead sole proximate cause as an affirmative defense).

Accordingly, there could be no error in defense counsel suggesting that plaintiff bore the burden of proof because plaintiff did, in fact, bear the burden of proving that Krklus' uncontrolled high blood pressure was not the sole proximate cause of his death. Put another way, plaintiff was required to prove that defendant's actions were also a proximate cause of Krklus' death.

Furthermore, in our view, defense counsel's comments did not shift the burden of proof. Though plaintiff does not specifically indicate the language to which she objects, presumably, she takes issue with defense counsel's comments:

> "What I'm saying to you, ladies and gentlemen, is doesn't Mr. Krklus bear some responsibility here for not following his doctor's orders? If you move beyond this issue of negligence, doesn't he bear some responsibility? He wouldn't have been, he wouldn't have had an aortic dissection and we wouldn't be in this situation if he had taken his blood pressure medications. Isn't his conduct actually the sole proximate cause of his death?
>
> Ladies and gentlemen, there is an issue about sole proximate cause. I believe this is the sole proximate cause of his death. If you

find this is the sole proximate cause of his death, you must find for *** the defendant."

We cannot agree with plaintiff that such a comment in any way shifted the burden of proof.

■ Plaintiff lastly contends that the trial court erred in instructing the jury on the theory of sole proximate cause. Again, defendants respond that plaintiff has forfeited her right to object to the instructions because, as discussed above, she did not request a special finding as to the basis of the jury's verdict and because the verdict is sustainable on the basis that Stanley was not negligent. While we agree with defendants, we further note that plaintiff's contention is without merit.

As stated above, a litigant has a right to have the jury fairly and clearly instructed on each theory supported by the evidence (*Ervin v. Sears, Roebuck & Co.*, 65 Ill. 2d 140, 145 (1976)) and jury instructions will be considered in their entirety (*Leonardi*, 168 Ill. 2d at 100). "An instruction is properly tendered to the jury where it is supported by some evidence in the record." *Diaz v. Kelley*, 275 Ill. App. 3d 1058, 1068 (1995). The question of what issues were raised by the evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion. *Leonardi*, 168 Ill. 2d at 102.

Plaintiff contends that the sole proximate cause instruction was erroneous for several reasons. First, plaintiff argues that the trial court erred in tendering the instructions because defendants represented during trial that they would not seek a sole proximate cause instruction. Aside from the fact that plaintiff has waived this argument because she has failed to cite supporting legal authority (*Owens*, 349 Ill. App. 3d at 45), plaintiff's argument fails because a defendant in a negligence action is not required to formally plead the defense of sole proximate cause. *Leonardi*, 168 Ill. 2d at 93-94.

Next, plaintiff argues that the trial court erred in tendering the sole proximate cause instruction because the theory applies only when a third party is the sole proximate cause of a plaintiff's injuries and the record did not establish that a third party caused Krklus' injury. Such an assertion is erroneous.

The long version of Illinois Pattern Jury Instructions, Civil, No. 12.05 (3d ed. 1994) (hereinafter IPI Civil 3d), which the jury in this case was read, provides:

"If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.

[However, if you decide that the sole proximate cause of injury to

the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant.]"

In contrast, IPI Civil 3d No. 12.04 provides:

"More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

[However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]"

The supreme court has clarified that "[t]he second paragraph of IPI Civil 3d No. 12.04 applies where there is evidence that *someone* other than the defendant is the sole proximate cause of the plaintiff's injury. In contrast, the second paragraph of IPI Civil 3d No. 12.05 applies where there is evidence that *something* other than the defendant's conduct is the sole proximate cause of the plaintiff's injury." (Emphasis in original.) *McDonnell v. McPartlin*, 192 Ill. 2d 505, 519 (2000). Accordingly, "[a] defendant has the right not only to rebut the evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, but also has the right to endeavor to establish by competent evidence that the conduct of a third person, *or some other causative factor*, is the sole proximate cause of plaintiff's injuries. Further, if the evidence is sufficient, the defendant is entitled to an instruction on this theory." (Emphasis added.) *Leonardi*, 168 Ill. 2d at 101.

In this case, the undisputed cause of Krklus' death was a massive hemothorax caused by an aortic dissection. At trial, Kopin testified that Krklus' uncontrolled high blood pressure caused his death and that even if the aortic dissection had been diagnosed on April 10, 1999, or April 19, 1999, Krklus would not have survived. From Kopin's testimony, the jury could conclude that Krklus' uncontrolled high blood pressure was the sole proximate cause of his death. Therefore, we cannot say that the trial court abused its discretion in tendering the jury the long version of IPI Civil 3d No. 12.05.

Plaintiff also argues that the trial court committed prejudicial error when it misread the sole proximate cause instruction to the jury.

In instructing the jury as to the second paragraph of IPI Civil 3d No. 12.05, the trial court stated, "however, if you decide that the sole proximate cause of injury to the plaintiff was the plaintiff's own negligence, then your verdict should be for the defendant." The trial court, immediately realizing its mistake, recalled the jury, read the correct instruction and provided the jury with a corrected written

copy. Plaintiff does not point to facts that indicate that the misreading and correction of the jury instructions prejudiced her case. Under these circumstances, we find that the jury was properly instructed and cannot conclude that plaintiff was prejudiced by the trial court's corrected misreading of the instructions.

For the above-stated reasons, we affirm the judgment of the trial court.

Affirmed.

REID, P.J., and THEIS, J., concur.